727 A.2d 1

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ALBERT FROST AND BARRY FROST,
DEFENDANTS–APPELLANTS.

Argued January 5, 1999—Decided April 15, 1999.

*Matthew Astore,* Deputy Public Defender II, argued the cause for appellants (*Ivelisse Torres,* Public Defender, attorney; *Mr. Astore* and *Michael C. Kazer,* Designated Counsel, on the briefs).

*Raymond W. Hoffman,* Assistant Prosecutor, argued the cause for respondent (*Patricia A. Hurt,* Essex County Prosecutor, attorney).

*Debra L. Stone,* Assistant Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Peter Verniero,* Attorney General, attorney; *Ms. Stone* and *Carol M. Henderson,* Deputy Attorney General, of counsel; *Ms. Henderson,* on the brief).

The opinion of the Court was delivered by

COLEMAN, J.

The issue presented in this appeal is whether certain prosecutorial comments made during the closing-argument phase of defendants' criminal trial deprived them of a fair trial. The Appellate Division in an unpublished opinion concluded that the prosecutor's comments were inappropriate, but harmless. We granted defendant Albert Frost's petition for certification. 153 *N.J.* 217, 708 *A.*2d 68 (1998). We now grant defendant Barry Frost's late petition for certification and reverse both defendants' convictions.

I

On November 16, 1995, cousins Albert and Barry Frost were arrested after the Newark Police Department conducted an undercover narcotics investigation at 1126 Broad Street. They were indicted for conspiracy, contrary to *N.J.S.A.* 2C:5–2 (count one); possession of cocaine, contrary to *N.J.S.A.* 2C:35–10a(1) (count two); possession of cocaine with intent to distribute, contrary to *N.J.S.A.* 2C:35–5b(3) (count three); possession of cocaine with intent to distribute within a school zone, contrary to *N.J.S.A.* 2C:35–7 (count four); two counts of distribution of cocaine, contrary to *N.J.S.A.* 2C:35–5b(3) (counts five and seven); two counts

of distribution of cocaine within a school zone, contrary to *N.J.S.A.* 2C:35–7 (counts six and eight); possession of marijuana with intent to distribute, contrary to *N.J.S.A.* 2C:35–5b(12) (count nine); and possession of marijuana in a quantity of one ounce or more, but less than five pounds, with intent to distribute, contrary to *N.J.S.A.* 2C:35–5b(11) (count ten).

In a joint trial, the State and defense presented conflicting accounts regarding the events of that day. The State's version of events was as follows. On November 16, 1995, Detective Hector Mejias of the Newark Police Department was instructed to attempt an undercover drug purchase at 1126 Broad Street, a suspected place of drug activity. As Mejias was approaching the building, he observed a male, later identified as James Bushrod, knock on a rear window of the building, call out "Al," and walk a short distance to a wrought-iron gate at the end of the building. A second male exited the building, took what appeared to be paper money from Bushrod, and returned to the building. About ten seconds later, the second male reappeared, opened the wrought-iron gate, and handed Bushrod a small white object. After Bushrod walked away, Mejias's "back-up team" arrested Bushrod and found a paper fold of suspected cocaine on his person.

Mimicking Bushrod's purchase, Mejias then walked to the target location, knocked on the rear window, and called out "Al." When a male, later identified as Barry Frost, came to the window, Mejias asked him for ten dollars worth of cocaine. Barry Frost met Mejias at the wrought-iron gate where Mejias purchased a paper fold containing what appeared to be cocaine with two marked five-dollar bills, commonly referred to as the "buy money."

After receiving the suspected cocaine, Mejias arrested Barry Frost. Barry Frost then screamed, "Narcos, narcos, flush it." Mejias's "back-up team" ran into an open apartment in the building and arrested Albert Frost as he was attempting to flush something down the toilet. A member of the "back-up team" testified that the police recovered thirty-one small bags of mari-

juana, twenty-two folds of cocaine, $225 in cash, and the "buy money" Mejias had given to Barry Frost.

The defense presented the jury with a different version of events. Barry Frost testified that at approximately 7:00 p.m. on November 16, 1995, he visited his cousin Albert Frost's apartment at 1126 Broad Street. About two hours into his visit, Barry Frost heard Bushrod calling for his cousin and went outside to see what he wanted. Bushrod asked Barry Frost if he could speak with a female named Stacy who was also in the apartment. Barry Frost went into the apartment to inform Stacy that Bushrod wanted to speak with her. She told him "okay." Barry Frost went back outside and told Bushrod of Stacy's response. Barry Frost had no further conversation with Bushrod, and Stacy never went outside. At no other time did Barry Frost go outside of the apartment.

Approximately five minutes later, while Barry Frost was standing in the apartment corridor, he heard "rumblings" at the apartment door. According to Barry Frost, the officers banged on the door until they were able to break through the wrought-iron gate and kick in the apartment door. At that point, the police entered the premises and arrested Albert and Barry Frost.

Based on those conflicting versions of the facts, defense counsel attacked the officers' credibility during closing arguments. Defense counsel suggested the officers' testimony that Barry Frost opened the wrought-iron gate to consummate the drug transaction made no sense because the area was a high-crime area, and because Barry Frost could have easily completed the transaction through the spaces in the gate. Additionally, defense counsel pointed out that the State failed to produce either the "buy money" or a photocopy of the "buy money" that Detective Mejias said he used to purchase drugs from Barry Frost.

In responding to defense counsel's closing argument, the prosecutor made several comments that the State now concedes were inappropriate. First, in an apparent attempt to rebut defense counsel's observation that although the officers claimed that cash was confiscated at the time of the arrest, none was produced at

trial, the prosecutor told the jury that "[t]he [S]tate is not allowed to bring the money in. It's confiscated." When Albert Frost's attorney objected, the trial court instructed the prosecutor to "Please continue." Accordingly, the prosecutor stated: "[The] State is not allowed to bring the money in. It's confiscated, it's in the reports." This time, Barry Frost's attorney objected to the prosecutor's reference to police reports that were not in evidence; the court sustained that objection. However, the court did not strike the comment from the record or instruct the jury to disregard the statement.

Second, in an attempt to bolster the officers' credibility, the prosecutor argued:

> I would submit to you, ladies and gentlemen, there is absolutely no evidence in this case that shows wrongdoing by the officers. There's no evidence that locks are cut. There's no evidence that doors were smashed. No evidence of any wrongdoing whatsoever. I'd submit this to you, ladies and gentlemen, *do you know the magnitude of the charges that could be brought against officers for such actions.*
> [Emphasis added.]

Defense counsel objected, but the trial court overruled the objection.

Lastly, the prosecutor made several disparaging comments about defendants' lawyers. He suggested that the jurors dismiss defense counsel's arguments as "lawyer talk":

> Look at the evidence, ladies and gentlemen, the Judge will tell you that. Look at the evidence before you, look at the counts before you, *don't be distracted by lawyer talk.* I'd ask you this. When you go into the jury room and an individual starts talking about, what about that lock—time out, time out. *That's lawyer talk.*
> [Emphasis added.]

Soon thereafter, the prosecutor told the jurors that "the bottom line in this case comes down to ... credibility and *I would submit to you that defense counsel is banking on that maybe one of you got a ticket last week and you got a bad taste in your mouth towards officers.*" (Emphasis added). The court sustained defense counsel's objections to this last comment. Again, the court failed to strike the comment from the record or instruct the jury to disregard it. Apart from sustaining two objections, the only curative action taken by the trial court was to inform the jury, as

part of its general instructions, to disregard the attorneys' comments on the evidence if those comments conflicted with the jury's recollection of the evidence.

The jury found defendants guilty on counts one through eight and on count ten. The court sentenced Albert Frost to an aggregate term of ten years with a five-year period of parole ineligibility. It sentenced Barry Frost to an aggregate term of five years with a three-year period of parole ineligibility.

On appeal, defendants argued that the prosecutor's summation exceeded the bounds of fair comment. The Appellate Division recognized that the prosecutor "struck several foul blows in this case." However, noting that the evidence against defendants was "overwhelming" and that "the trial record fairly shrieks of defendant's [sic] guilt," the panel determined that the prosecutor's comments did not affect the fairness of the trial, and were not so grievous as to have the capacity to lead to an unjust result. Nonetheless, the panel was "concerned that by affirming defendants' convictions despite the prosecutor's derelictions, [it] may be encouraging future misconduct." Therefore, the panel referred the matter to the Attorney General "for his review with the hope that corrective action [would] be taken."

## II

Defendants argue simply that the prosecutor's comments during summation deprived them of a fair trial. Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented. *State v. Harris*, 141 *N.J.* 525, 559, 662 *A.*2d 333 (1995); *State v. Williams*, 113 *N.J.* 393, 447, 550 *A.*2d 1172 (1988). Indeed, prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries. *Harris, supra,* 141 *N.J.* at 559, 662 *A.*2d 333. Justice Clifford's observations in his dissent in *State v. DiPaglia*, 64 *N.J.* 288, 315 *A.*2d 385 (1974), are worth repeating:

Criminal trials are emotionally charged proceedings. A prosecutor is not expected to conduct himself in a manner appropriate to a lecture hall. He is entitled to be forceful and graphic in his summation to the jury, so long as he confines himself to fair comments on the evidence presented.

[*Id.* at 305, 315 *A.*2d 385 (Clifford, J., dissenting) (citations omitted).]

 Nevertheless, "the primary duty of a prosecutor is not to obtain convictions, but to see that justice is done." *State v. Ramseur,* 106 *N.J.* 123, 320, 524 *A.*2d 188 (1987). "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *State v. Farrell,* 61 *N.J.* 99, 105, 293 *A.*2d 176 (1972) (quoting *Berger v. United States,* 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935)).

 Thus, this Court has held that prosecutorial misconduct can be a ground for reversal where the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial. *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188; *State v. Siciliano,* 21 *N.J.* 249, 262, 121 *A.*2d 490 (1956). In determining whether a prosecutor's misconduct was sufficiently egregious, an appellate court "must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." *State v. Marshall,* 123 *N.J.* 1, 153, 586 *A.*2d 85 (1991); *see also State v. Scherzer,* 301 *N.J.Super.* 363, 433, 694 *A.*2d 196 (App.Div.), *certif. denied,* 151 *N.J.* 466, 700 *A.*2d 878 (1997). Specifically, an appellate court must consider (1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them. *Marshall, supra,* 123 *N.J.* at 153, 586 *A.*2d 85; *Ramseur, supra,* 106 *N.J.* at 322–23, 524 *A.*2d 188; *State v. G.S.,* 278 *N.J.Super.* 151, 173, 650 *A.*2d 819 (App.Div.1994), *rev'd on other grounds,* 145 *N.J.* 460, 678 *A.*2d 1092 (1996); *State v. Ribalta,* 277 *N.J.Super.* 277, 294, 649 *A.*2d 862 (App.Div.1994), *certif. denied,* 139 *N.J.* 442, 655 *A.*2d 444 (1995). Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. *Ramseur,*

*supra,* 106 *N.J.* at 323, 524 *A.*2d 188. The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made. The failure to object also deprives the court of an opportunity to take curative action. *State v. Bauman,* 298 *N.J.Super.* 176, 207, 689 *A.*2d 173 (App.Div.), *certif. denied,* 150 *N.J.* 25, 695 *A.*2d 668 (1997).

In *State v. Acker,* 265 *N.J.Super.* 351, 627 *A.*2d 170 (App.Div.), *certif. denied,* 134 *N.J.* 485, 634 *A.*2d 530 (1993), a case that charged the defendant with second-degree sexual assault upon two females less than thirteen-years old, the prosecutor characterized the defense attorney and the defense as "absolutely preposterous" and "absolutely outrageous." The prosecutor also argued that it was the jury's function to protect young victims of alleged sexual offenses; that defendant was intoxicated in one instance, despite knowing that the accusation was baseless; and that if the jury believed one of the victims, it essentially had to believe the other. *Id.* at 356–58, 627 *A.*2d 170. The court found the prosecutor's conduct to be improper and misleading, and concluded that the prosecutor's conduct was sufficiently egregious to warrant a reversal of defendant's conviction. *Id.* at 358, 627 *A.*2d 170.

Similarly, prosecutorial misconduct in *State v. Staples,* 263 *N.J.Super.* 602, 623 *A.*2d 791 (App.Div.1993), required reversal of a defendant's conviction. That case involved a narcotics conviction stemming from an undercover officer's alleged purchase of cocaine from the defendant. The Appellate Division held that "in personally vouching for the credibility of the State's witnesses, in suggesting that police witnesses are believable because of their status as policemen and in suggesting that an acquittal could significantly jeopardize their professional careers, the prosecutor violated fundamental restraints against prosecutorial excesses." *Id.* at 606–07, 623 *A.*2d 791. In reversing the conviction, the panel stated that the prosecutor had strayed beyond the acceptable limits of advocacy. *Ibid.*

The prosecutor's conduct in the present case was neither appropriate nor harmless. His statements regarding the "buy

money" were highly improper. Prosecutors should not make inaccurate legal or factual assertions during a trial. *See State v. Engel*, 249 *N.J.Super.* 336, 381, 592 *A.*2d 572 (App.Div.), *certif. denied*, 130 *N.J.* 393, 614 *A.*2d 616 (1991) (recognizing that prosecutor erred when he made inaccurate factual assertion). They are duty-bound to confine their comments to facts revealed during the trial and reasonable inferences to be drawn from that evidence. *State v. Marks*, 201 *N.J.Super.* 514, 534, 493 *A.*2d 596 (App.Div. 1985), *certif. denied*, 102 *N.J.* 393, 508 *A.*2d 253 (1986). Here, the prosecutor's statement that the "buy money" could not be introduced at trial was simply a misstatement of the law. There is no legal impediment that prevented the State from introducing the "buy money" into evidence. Indeed, that is precisely why undercover officers use marked bills to make drug purchases. Here, the officers retrieved the "buy money" from the seller at the time of his arrest. The fact that the "buy money" was Detective Mejias's own personal money did not change the purpose for using marked bills. The mention of the "buy money" in a report that was not in evidence was not a legal substitute for the "buy money" as evidence. Thus, the prosecutor's comments were not only inaccurate, they were misleading as well.

Even more egregious was the prosecutor's suggestion that the police officers would not lie because of the "magnitude" of charges that could be brought against them. Our courts have consistently held that such statements by a prosecutor about a police officer's credibility are wholly inappropriate. *See, e.g., State v. Goode*, 278 *N.J.Super.* 85, 90, 650 *A.*2d 393 (App.Div.1994) (recognizing that it was improper for prosecutor to tell jury that police had no motive to lie); *Staples, supra*, 263 *N.J.Super.* at 604–06, 623 *A.*2d 791 (recognizing impropriety of prosecutor asking officer "is your career and the penalties that you would sustain for perjuring yourself worth the conviction for a $20.00 bag of cocaine?" during direct examination); *Engel, supra*, 249 *N.J.Super.* at 379, 592 *A.*2d 572 (recognizing that it was improper for prosecutor to tell jury that investigators were "good men who leave their family [and] work day and night" and would not "jeopardize their careers" over

defendants); *State v. West*, 145 *N.J.Super.* 226, 233–34, 367 *A.2d* 453 (App.Div.1976), *certif. denied,* 73 *N.J.* 67, 372 *A.2d* 332 (1977) (finding improper prosecutor's statements that police officer would not lie because "[t]here is a lot of harm that could come to him" and because "the police officer's career would be finished in a minute"); *State v. Jones,* 104 *N.J.Super.* 57, 65, 248 *A.2d* 554 (App.Div.1968), *certif. denied,* 53 *N.J.* 354, 250 *A.2d* 755 (1969) (stating that it is "obviously improper" to imply that police testimony should be accepted, "not because of its believability but because the witnesses were policemen"). The problem with this kind of exhortation is that it unfairly invites the jury to speculate concerning whether the effect of an acquittal would be to terminate the officer's career. As we explained in *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.2d* 188, "[s]tatements such as those made by the prosecutor are improper because they divert the jurors' attention from the facts of the case before them."

Likewise, we find the prosecutor's comments suggesting that defense counsel's closing arguments were "lawyer talk," and that defense counsel hoped that one or more jurors had "a bad taste in [their] mouth towards officers" to be improper. "A prosecutor is not permitted to cast unjustified aspersions" on defense counsel or the defense. *State v. Lockett,* 249 *N.J.Super.* 428, 434, 592 *A.2d* 617 (App.Div.), *certif. denied,* 127 *N.J.* 553, 606 *A.2d* 366 (1991); *see also Scherzer, supra,* 301 *N.J.Super.* at 445, 694 *A.2d* 196; *Acker, supra,* 265 *N.J.Super.* at 356, 627 *A.2d* 170. Defense counsel should not be subjected to disparaging remarks for simply doing his or her job.

A review of the record reveals that although defense counsel immediately objected to all but one of the prosecutor's improper remarks, little if anything was done by way of curative action. Besides sustaining two of defense counsel's objections, the court's only action was to instruct jurors in its subsequent general charge to disregard the attorneys' comments on the evidence during summation if those comments conflicted with their recollection of the evidence. Sometimes such a general charge may serve to

ameliorate potential prejudice caused by remarks that are only slightly improper. *State v. Setzer,* 268 *N.J.Super.* 553, 566, 634 *A.*2d 127 (App.Div.1993), *certif. denied,* 135 *N.J.* 468, 640 *A.*2d 850 (1994); *State v. Watson,* 224 *N.J.Super.* 354, 362, 540 *A.*2d 875 (App.Div.), *certif. denied,* 111 *N.J.* 620, 546 *A.*2d 537, *cert. denied,* 488 *U.S.* 983, 109 *S.Ct.* 535, 102 *L.Ed.*2d 566 (1988). However, considering the cumulative effect of the prosecutorial improprieties in this case, the single curative instruction was insufficient to overcome the potential prejudicial nature of the prosecutor's improper remarks. *See State v. Rose,* 112 *N.J.* 454, 523, 548 *A.*2d 1058 (1988).

We disagree with the Appellate Division's conclusion that although many of the prosecutor's comments were improper, because the "evidence of defendant's [sic] guilt was overwhelming" a reversal was not warranted. Credibility was the critical issue in the case. All of the prosecutor's improper remarks related to the credibility of the officers' testimony. The State's entire case rested on the testimony of the officers. When a jury must choose which of two opposing versions to credit, it simply cannot be said that the evidence is overwhelming. Here, the jury's determination hinged completely on whether the jurors believed the officers' testimony or defendant Barry Frost's testimony.

Even if the evidence were overwhelming, that could never be a justifiable basis for depriving a defendant of his or her entitlement to a constitutionally guaranteed right to a fair trial. The impact of violating a defendant's right to a fair trial cannot be measured by, or weighed against, the quantum of evidence bearing upon his or her guilt. *State v. Simon,* 79 *N.J.* 191, 206, 398 *A.*2d 861 (1979); *State v. Salzman,* 228 *N.J.Super.* 109, 115, 549 *A.*2d 46 (App.Div. 1987).

This Court has repeatedly expressed concern for prosecutorial propriety. We have said time and again that "because the prosecutor represents the government and people of the State, it is reasonable to say that jurors have confidence that he will fairly fulfill his duty to see that justice is done whether by conviction of the guilty or acquittal of the innocent." His comments

during opening and closing carry the full authority of the State. Hence, we cannot sit idly by and condone prosecutorial excesses.

[*State v. Spano*, 64 *N.J.* 566, 568, 319 *A.*2d 217 (1974) (citations omitted).]

Despite those concerns, "instances of prosecutorial excesses . . . seem to come to [our appellate courts] with numbing frequency." *Watson, supra,* 224 *N.J.Super.* at 362, 540 *A.*2d 875. Often, as occurred in this case, such derelictions go unpunished because it is clear that no prejudice to the defendant resulted. *Id.* at 363, 540 *A.*2d 875. It has been suggested that an automatic reversal rule "might well have prophylactic value in deterring future misconduct." *Ibid.*

█ Today we do not adopt a *per se* rule that requires reversal of every conviction whenever there is evidence of egregious prosecutorial misconduct during trial. We stress, nonetheless, "that prosecutors should confine their summations to a review of, and an argument on, the evidence, and not indulge in improper expressions of personal or official opinion as to the guilt of the defendant, or [otherwise engage] in collateral improprieties of any type, lest they imperil otherwise sound convictions." *State v. Thornton,* 38 *N.J.* 380, 400, 185 *A.*2d 9 (1962), *cert. denied sub nom., Thornton v. New Jersey,* 374 *U.S.* 816, 83 *S.Ct.* 1710, 10 *L.Ed.*2d 1039 (1963); *see also Spano, supra,* 64 *N.J.* at 569, 319 *A.*2d 217 (noting that sometimes severe action is necessary to curb prosecutorial misconduct); *Farrell, supra,* 61 *N.J.* at 104, 293 *A.*2d 176 (citing rules of professional responsibility to remind prosecutors of their role as State's attorneys); *State v. D'Ippolito,* 19 *N.J.* 540, 549, 117 *A.*2d 592 (1955) (stressing that the "[t]he primary duty of a lawyer engaged in public prosecution is not to convict, but to see that justice is done"). They also risk having the matter referred to the appropriate district ethics committee.

Although we do not ·establish a *per se* rule, a reversal is required in this case. The critical issue was credibility, and the prosecutor improperly impugned the credibility of defendants' version of the facts, thereby interfering with the jury's right to make the credibility determination. Consequently, we are satisfied that the prosecutor's misconduct had the clear capacity to

have led to an unjust verdict. *State v. McCloskey,* 90 *N.J.* 18, 30, 446 *A.*2d 1201 (1982); *State v. Macon,* 57 *N.J.* 325, 335, 273 *A.*2d 1 (1971).

## III

██ In view of the egregious prosecutorial misconduct that occurred in this case, we are compelled to consider what if any action should be taken against the trial prosecutor *personally* to discourage such blatant misconduct in the future. *See Ramseur, supra,* 106 *N.J.* at 323–24, 524 *A.*2d 188 (stating possible violations of special ethical rules governing prosecutors may be referred to appropriate district ethics committee for disciplinary action); *see also Watson, supra,* 224 *N.J.Super.* at 363, 540 *A.*2d 875 (same). The Appellate Division referred this matter to the Attorney General who, as the chief law enforcement officer of the State, has supervisory powers over prosecutors. *See N.J.S.A.* 52:17B–98. The Attorney General wrote the assistant prosecutor a letter of reprimand. Because this was the young assistant prosecutor's first jury trial, and because he had left the Essex County Prosecutor's Office, that letter was a sufficient personal sanction in this case. Again, we remind prosecutors that they have "a unique role and responsibility in the administration of criminal justice and, therefore, have an extraordinary power to undermine or destroy the efficacy of the criminal justice system." *In re Rachmiel,* 90 *N.J.* 646, 656, 449 *A.*2d 505 (1982). "The sound administration of criminal justice in our democracy requires that both the end and the means be just." *State v. Orecchio,* 16 *N.J.* 125, 129, 106 *A.*2d 541 (1954).

The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division for a new trial.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.