**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5226-14T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

CHRISTOPHER DESA a/k/a
CHRISTOPHER L. DESA,

      Defendant-Appellant.

_____

      Submitted May 30, 2017 — Decided  June 8, 2017

      Before Judges Haas and Currier.

      On appeal from Superior Court of New Jersey,
      Law Division, Middlesex County, Indictment No.
      15-02-0180.

      Joseph E. Krakora, Public Defender, attorney
      for appellant (Susan Brody, Deputy Public
      Defender, of counsel and on the brief).

      Andrew C. Carey, Middlesex County Prosecutor,
      attorney for respondent (Joie Piderit,
      Assistant Prosecutor, of counsel and on the
      brief).

PER CURIAM

    On February 11, 2015, a Middlesex County grand jury returned

an eighteen-count indictment against defendant Christopher Desa,

charging him with multiple offenses that began with an alleged armed robbery on October 16, 2012. Following a multi-day trial, the jury found defendant guilty of first-degree robbery, N.J.S.A. 2C:15-1 (count one); fourth-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a) (count three); second-degree eluding a law enforcement officer, N.J.S.A. 2C:29-2(b) (count six); third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3) (count seven); two counts of second-degree aggravated assault by causing injury to another while fleeing or attempting to elude a law enforcement officer, N.J.S.A. 2C:12-1(b)(6) (counts twelve and thirteen); third-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1) (count sixteen); and fourth-degree unlawful possession of an imitation firearm, N.J.S.A. 2C:39-4(e) (count eighteen).[1]

On June 8, 2015, the trial judge sentenced defendant[2] to fifteen years in prison on count one, subject to the 85% parole ineligibility provisions of the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, with a five-year period of parole supervision following his release; an eighteen-month concurrent term on count three; a nine-year consecutive term on count six, subject to NERA,

---

[1] The jury found defendant not guilty of the remaining charges in the indictment.

[2] Prior to imposing the sentence, the trial judge denied the State's motion to sentence defendant to a discretionary extended term as a persistent offender.

with a three-year period of parole supervision upon release; a concurrent six-month term on count seven, subject to NERA; a consecutive seven-year term on count twelve, subject to NERA, with a three-year period of parole supervision upon release; a consecutive seven-year on count thirteen, subject to NERA, with a three-year period of parole supervision upon release; a concurrent three-year term on count sixteen; and a concurrent one-year term on count eighteen. Thus, the judge imposed an aggregate thirty-eight-year term. This appeal followed.

On appeal, defendant raises the following contentions:

POINT I

BY ESSENTIALLY TURNING HIS OPENING STATEMENT INTO A SUMMATION, AND BY THEREIN PORTRAYING DEFENDANT AS A CALLOUS MONSTER WITHOUT HAVING ANY SUPPORT IN THE RECORD FOR HIS CLAIMS, THE PROSECUTOR DEPRIVED DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL. (Not Raised Below).

POINT II

THE COURT ERRED IN FAILING TO MERGE FOR SENTENCING PURPOSES DEFENDANT'S ELUDING CONVICTION [COUNT SIX] INTO HIS CONVICTIONS FOR CAUSING INJURY WHILE ELUDING [COUNTS TWELVE AND THIRTEEN]. (Not Raised Below).

We have considered these arguments in light of the record and applicable legal standards. We affirm defendant's convictions. However, we remand the matter to the trial court to vacate the sentence imposed on count six, and merge the conviction on that

count into the convictions on counts twelve and thirteen.  In all other respects, we affirm the sentence imposed.

I.

We derive the following facts from the evidence produced by the parties at trial.  At approximately 9:30 a.m. on October 16, 2012, Yazmine Jimenez and her husband Christian were working in a deli that was owned by Yazmine's[3] parents.  A man entered the store wearing a black hoodie and dark blue jeans.  The man's face was not covered.  Yazmine, who was working behind the counter, later identified the man as defendant.

Defendant pretended he was going to make a purchase, but then took out a black gun and demanded money.  Yazmine opened the cash drawer where lottery proceeds were kept, and defendant grabbed between $300 and $350.  Defendant then ran out of the store.  As soon as defendant left, Yazmine told Christian that she had been robbed, and Christian ran out of the store looking for defendant.

When he got outside, Christian saw a man running away and chased him.  As Christian closed in, the man looked over his shoulder and said, "I'm going to shoot you bitch.  Stop following me."  Christian stopped pursuing the man for a few moments, and

---

[3] Because Yazmine and Christian share the same surname, we refer to them by their first names to avoid confusion.  In doing so, we intend no disrespect.

then turned down a driveway to look for him. Christian heard tires screeching and saw a man wearing a black hoodie drive a Jeep out of a driveway near a doctor's office. Christian wrote down the car's license number on his arm and ran back to the deli.

By that time, Yazmine was on the telephone with the police and she and Christian described the man and reported the car's license number to the dispatch officer, who broadcasted the information to available police units. One of the officers who heard the dispatch, Detective Dan Kapsch, recognized the license plate number of the suspect's Jeep as belonging to Gemma Bumback, his father's former girlfriend. The detective knew that Bumback and defendant were friends and that Bumback allowed defendant to drive her Jeep. Based on this information, the officers located a photograph of defendant, which Yazmine identified as the man who robbed her.

After defendant was identified, the police were able to monitor his cellphone pings, which showed that defendant was at a motel. Several officers responded to that location. Suddenly, an officer saw the Jeep pull out of a parking spot, and alerted the other officers, who began yelling at defendant to stop, show his hands, and get out of the car. Defendant then crashed the Jeep into a police car, and momentarily stopped. Detective Todd Ritter ran to the car and began hitting the window with his gun

5

in an attempt to break it. As he did so, the detective saw that defendant had a black handgun on his lap. Detective Ritter shot several rounds into the car while yelling at defendant to get out of the car. The officer believed that some of the shots hit defendant. However, defendant drove away, striking Officer Ritter with the car and running over his foot.

Defendant immediately hit the concrete median on the highway and some street signs, but he kept going. A New Jersey Transit police officer saw defendant's car driving erratically and activated his overhead lights, signaling defendant to pull over. Defendant failed to do so, and the officer pursued him through a number of red lights at speeds up to ninety miles an hour. Other officers joined in the pursuit. Defendant still would not stop and he hit approximately twelve other vehicles as he drove. After about two miles, defendant crashed into another car, causing injuries to the occupants, Ronald and Carol Cooper.

Finally, defendant drove his car head-on into a pole. The officers ran to the car and saw that defendant had sustained several gunshot wounds. The officers removed defendant from the Jeep, handcuffed him, and called for medical assistance. Defendant told the police that he had thrown the gun out of the car window during the chase. A number of private citizens soon reported that there was a gun in the right-hand lane of the highway. An officer

retrieved the gun, which Detective Ritter later identified as the same one he saw on defendant's lap in the motel parking lot.

At trial, a witness who worked at the doctor's office near the deli testified that she saw a man wearing a hooded jacket and dark pants park a Jeep in the nearby parking lot. A few minutes later, she observed the same man running back to the Jeep from the direction of the deli. The man appeared to be upset and he drove away at a high rate of speed.

Before they located defendant at the motel, the police contacted defendant's girlfriend, Cynthia Guzman, to determine if she knew where he was. Guzman called defendant and told him the police were searching for him. Defendant told Guzman that he was not where the police thought he was and that he did not have Bumback's car.

Bumback testified that she and defendant stayed together at a motel on October 15, the night before the robbery. Bumback stated that she was intoxicated and fell asleep as soon as she and defendant checked into the motel. The next morning, defendant woke Bumback up around check-out time. Bumback testified that defendant was in a "panic" because he said he had a fight with his girlfriend. Defendant told Bumback that they had to leave the motel right away because he was afraid his girlfriend would call the police on him.

A-5226-14T2

Defendant and Bumback then checked out, got something to eat, bought some liquor and beer, and checked into a different motel, which was the one where the police chase began. Bumback stated that defendant kept looking out of the window of the motel room. Defendant told Bumback that he was going to get something from the car, and he went outside. Bumback then heard screeching tires and gun shots.

Defendant testified on his own behalf. According to defendant, he used Bumback's car on October 16, 2015 without her permission to drive to the parking lot near the deli so he could purchase some marijuana from a dealer he knew was in the area. He stated he took a starter pistol with him because he had been robbed in the past while buying drugs.

After defendant completed the transaction, he heard someone screaming. Fearful that he would be caught with the marijuana, defendant got into the Jeep and "peeled out" of the parking lot. As defendant was driving back to the motel, Guzman called him and defendant told her that they needed to break up. In response, defendant claimed that Guzman stated that the police were looking for him in connection with a robbery. Defendant testified that he thought Guzman was trying to trick him into coming to see her, so he hung up the phone. Defendant then drove to his house and picked up approximately $200.

Defendant returned to the motel room where Bumback was still sleeping, work her up, and told her they had to leave because Guzman might come looking for him. After buying food and liquor along the way, defendant and Bumback checked into the second motel, where they stayed until defendant decided they needed to get more vodka. Defendant stated that he got in Bumback's car and turned on the music, so he never heard any of the police officers yelling at him. Suddenly, someone smashed the car window. Defendant testified that he believed he was about to be robbed, so he drove off. As defendant did so, he was shot several times.

As he drove wildly down the highway, defendant claimed that he still did not realize that the men in the cars pursuing him were police officers. He admitted that he threw the starter pistol away as he drove. Defendant denied robbing the deli or telling Christian to stop following him or he would shoot him.

## II.

In Point I, defendant contends for the first time on appeal that the prosecutor made comments during his opening statement to the jury that were not supported by the record and "set a distorted tone for the trial." Because there were no objections to the prosecutor's opening remarks at trial, we review this claim using the plain error standard. See R. 2:10-2 (the error must be of "such a nature as to have been clearly capable of producing an

unjust result"). Applying this standard, we conclude that defendant's argument lacks sufficient merit to warrant extended discussion in a written opinion. R. 2:11-3(e)(2). We add the following brief comments.

During opening statements, a prosecutor should confine his or her comments to the facts the State intends to prove at trial with competent evidence. State v. Wakefield, 190 N.J. 397, 442 (2007), cert. denied, 552 U.S. 1146, 128 S. Ct. 1074, 169 L. Ed. 2d 817 (2008). "[I]n order to justify reversal, the [prosecutor's] misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'" State v. Smith, 167 N.J. 158, 181 (2001) (quoting State v. Frost, 158 N.J. 76, 83 (1999)). The prosecutor's conduct must constitute a clear infraction and "substantially prejudice the defendant's fundamental right to have a jury fairly evaluate the merits of his [or her] defense" in order to warrant reversal. State v. Roach, 146 N.J. 208, 219, cert. denied, 519 U.S. 1021, 117 S. Ct. 540, 136 L. Ed. 2d 424 (1996) (citation omitted).

The prosecutor's "performance must be evaluated in the context of the entire trial[.]" State v. Negron, 355 N.J. Super. 556, 576 (App. Div. 2002). Also relevant to our review is a defendant's failure to object to the prosecutor's remarks at the time they were made because this "deprives the court of an

opportunity to take curative action" and suggests that the defendant did not find the comments prejudicial. <u>Frost</u>, <u>supra</u>, 158 <u>N.J.</u> at 84.

Our review of the complete transcript satisfies us that there was no prosecutorial misconduct requiring reversal of defendant's convictions. The prosecutor's opening statement was limited to the facts the State later presented at trial and his comments drew legitimate inferences from those factors. Therefore, we reject defendant's contention on this point.

### III.

Defendant next argues that the trial judge erred at sentencing by failing to merge his conviction for eluding (count six) into his two convictions for aggravated assault while fleeing or attempting to elude a law enforcement officer (counts twelve and thirteen). We agree that the convictions should have merged.

Our Supreme Court has stated:

> Merger is based on the principle that "an accused [who] has committed only one offense . . . cannot be punished as if for two." Merger implicates a defendant's substantive constitutional rights. The analysis is similar to a double jeopardy analysis. Slightly different interests are involved, however. In double jeopardy cases the defendant seeks to avoid both multiple prosecution and multiple punishment; in merger cases, only multiple punishments are at issue.

11

The first step is to compare the statutes defining the offenses at issue.

[State v. Miller, 108 N.J. 112, 116 (1987) (alteration in original) (quoting State v. Davis, 68 N.J. 69, 77 (1975)) (citations omitted).]

Eluding can be either a second- or third-degree offense depending upon whether the actor's conduct "creates a risk of death or injury to any person." N.J.S.A. 2C:29-2(b). On the other hand, N.J.S.A. 2C:12-1(b)(6) provides that an actor is guilty of second-degree aggravated assault if he or she:

[c]auses bodily injury to another person while fleeing or attempting to elude a law enforcement officer in violation of [N.J.S.A. 2C:29-2(b)] . . . Notwithstanding any other provision of law to the contrary, a person shall be strictly liable for a violation of this subsection upon proof of a violation of [N.J.S.A. 2C:29-2(b)]. . . .

According to one noted commentator, "[t]he second degree crime defined by [N.J.S.A. 2C:12-1(b)(6)] is not really an assault crime. The provision serves to increase the penalty for operating a motor vehicle in violation of . . . [N.J.S.A. 2C:29-2(b)] (eluding a police officer) when an injury occurs." Cannel, New Jersey Criminal Code Annotated, comment 11 on N.J.S.A. 2C:12-1 (2017). In other words, it would appear that the Legislature has determined that eluding is a third-degree crime, but, if the actor's conduct creates a "risk of death or injury" or actually

"[c]auses bodily injury," eluding becomes a second-degree offense. <u>N.J.S.A.</u> 2C:29-2(b); <u>N.J.S.A.</u> 2C:12-1(b)(6).

"<u>N.J.S.A.</u> 2C:1-8(a) establishes the legislative parameters for merger of offenses." <u>State v. Diaz</u>, 144 <u>N.J.</u> 628, 637 (1996). It provides: "When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. . . [but] [h]e [or she] may not . . . be convicted of more than one offense if . . . [o]ne offense is included in the other." An offense is included in another if:

> (1) It is established by proof of the same or less than all the facts to establish the commission of the offense charged; or
>
> . . . .
>
> (3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.
>
> [<u>N.J.S.A.</u> 2C:1-8(d)(1) and (3).]

Strictly applying the statutory analysis, it is apparent that third-degree eluding is a lesser-included offense of both second-degree eluding and aggravated assault while eluding. However, neither second-degree eluding nor aggravated assault while eluding are "included" within each other. Theoretically, one can be guilty of eluding without creating "a risk of death or injury," yet be

"strictly liable" if an injury actually occurs and, therefore, guilty of aggravated assault. N.J.S.A. 2C:29-2(b); N.J.S.A. 2C:12-1(b)(6). Conversely, one can create the risk of injury but not cause an actual injury and, thus, be guilty of second-degree eluding but not guilty of an aggravated assault.

The Supreme Court has stated:

> The standard for merger of offenses set forth at N.J.S.A. 2C:1-8 . . . has been characterized as "mechanical." State v. Truglia, 97 N.J. 513, 520 (1984). A preferred and more flexible standard was articulated in the pre-code case of State v. Davis, 68 N.J. 69 (1975).
>
> [Diaz, supra, 144 N.J. at 637 (parallel citation omitted).]

This "more flexible standard"

> entail[s] analysis of the evidence in terms of . . . the time and place of each purported violation; whether the proof submitted as to one count of the indictment would be a necessary ingredient to a conviction under another count; whether one act was an integral part of a larger scheme or episode; the intent of the accused; and the consequences of the criminal standards transgressed.
>
> [Davis, supra, 68 N.J. at 81.]

"Guidance also arises from the principle that 'the Legislature may fractionalize a single criminal episode into separate offenses when the Legislature intends them to be punished separately and when the fractionalization does not offend

constitutional principles.'" State v. Hill, 182 N.J. 532, 543 (2005) (quoting State v. Mirault, 92 N.J. 492, 504 (1983)).

In this case, the evidence clearly demonstrated that defendant eluded the police and, while in the course of continuing to elude the officers, defendant's Jeep struck the Cooper vehicle causing injuries to its two occupants. In our opinion, the eluding and the assault occurred congruently in "the time and place"; "the proof submitted" as to the eluding was a "necessary ingredient to a conviction" for the aggravated assault; the eluding "was an integral part of a larger scheme or episode[,]" namely, the aggravated assault; and "the intent" of defendant was the same, i.e., to flee the officers. Davis, supra, 68 N.J. at 81. Therefore, the eluding conviction under count six merges into the two aggravated assault convictions under counts twelve and thirteen.

In sum, we affirm defendant's convictions. However, we remand the matter to the trial court for the entry of an amended judgment of conviction vacating the separate sentence on count six and reflecting the merger of that count into counts twelve and thirteen. We otherwise affirm defendant's sentence. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15

A-5226-14T2