JUSTICE LaVECCHIA, dissenting.
Although prosecutors may piece together evidence during summation, they may not create pieces of evidence. In this trial, the assistant prosecutor crossed that line when he, in effect, testified during closing argument about vital "evidence" that no witness had presented.
This appeal involves a tragic and horrific murder. The key question for the jury was whether defendant committed it. According to the State's theory, defendant retaliated for a fight earlier in the day by shooting at his assailants in a restaurant while driving by in a carjacked silver Malibu. Beforehand, defendant allegedly scouted out the restaurant while driving a black Cadillac CTS, the same car a neighbor supposedly saw him drive earlier near his home. Critical to the State's theory was the need to link a black Cadillac CTS to the drive-by shooting and to defendant.
The State introduced grainy surveillance videos taken at night in the vicinity of the restaurant. They depicted cars passing by the area before and around the time of the shooting. In closing **282 argument, the prosecutor declared -- no fewer than six times -- that the video depicted a black Cadillac CTS passing the restaurant before the shooting. No witness, however, testified to that key fact. The neighbor testified that she had seen defendant drive a black, four-door car that looked like a Cadillac. She could not and did not identify it as a CTS. She was not asked whether any cars depicted in any videos matched what she had *860 seen. Nor did the State call a qualified lay or expert witness who might have offered testimony about the model of the cars in the short, grainy video clips. Defense counsel, of course, could have challenged such testimony on cross-examination.
Rather than present evidence, the prosecutor provided the link himself. He did not suggest it was reasonable for jurors to infer what type of car appeared in the videos. Instead, he told the jury what it was -- a "Cadillac CTS" -- time after time. Compounding that error, he also miscast the neighbor's account of events and said she testified defendant "got into a black Cadillac CTS."
The key link, tying a black Cadillac CTS both to the shooting and to defendant, first surfaced in closing argument in the form of testimony from the prosecutor. Because I cannot conclude that the error was harmless, I respectfully dissent.
I.
For prosecutorial misconduct to require reversal, the prosecutor's conduct must "deprive[ ] the defendant of a fair trial." State v. Frost, 158 N.J. 76, 83, 727 A.2d 1 (1999) (citing State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987) ). Insuring "that the jury's impartial deliberations are based solely on the evidence" is an essential aspect to the guarantee of a fair trial in a criminal case. State v. Purnell, 126 N.J. 518, 531, 601 A.2d 175 (1992) (citing State v. Simon, 79 N.J. 191, 206, 398 A.2d 861 (1979) ). Accordingly, a prosecutor must limit summation comment to "facts shown by or reasonably to be inferred from the evidence." State v. Carter, 91 N.J. 86, 125, 449 A.2d 1280 (1982) (citing **283 State v. Farrell, 61 N.J. 99, 102, 293 A.2d 176 (1972) ; State v. Johnson, 31 N.J. 489, 158 A.2d 11 (1960) ; State v. Bogen, 13 N.J. 137, 98 A.2d 295 (1953) ).
The prosecutor's obligation in that regard is as primary as that of the court superintending the trial because, when seeking a conviction, a prosecutor bears a dual obligation to see that the trial is fair and the resultant conviction is just. State v. Smith, 212 N.J. 365, 402-03, 54 A.3d 772 (2012). Although adversarial, our system of criminal justice does not tolerate convictions achieved by improper methods and, thus, when summing up the State's basis for asking a jury to convict a defendant, a prosecutor is obliged to confine summation remarks to the evidence in the case and only those reasonable inferences that may be drawn from that evidence. See State v. Bradshaw, 195 N.J. 493, 510, 950 A.2d 889 (2008).
II.
A.
As the majority opinion explains, the charges against defendant arise from a carjacking and a drive-by shooting into a restaurant in Newark. According to the State's theory of the case, in retaliation for a fight earlier that night, defendant first cased the restaurant by driving by it; he then stole a car, a silver Malibu, and used the Malibu to conduct a drive-by shooting at a local chicken restaurant where the assailants from the earlier fight were eating. Several people were injured, and an off-duty police officer, who was a patron in the restaurant, tragically was killed.
A neighbor and witness to the fight, R.S., testified that she saw defendant leave the family's home, after the fight, with his stepfather in his stepfather's blue pickup truck, and then return in separate vehicles. R.S. explained that defendant's stepfather returned in the pickup truck and defendant returned in a black vehicle that looked like a newer model Cadillac. In response to questioning she said, "I'm not *861 sure if that's like the CTS, but it wasn't the boxy one, it was like the round -- the one after that." **284 She could not identify the black car as a Cadillac CTS. When asked to further describe the car she could only add, "[t]he four-door."[1] R.S. testified that she saw the blue pickup truck leave again, this time followed by the black vehicle. According to R.S., defendant's stepfather returned in his pickup truck alone. R.S. did not see defendant return after that, but did notice the black vehicle parked in front of defendant's house some time later.
At trial, R.S. was shown still photographs of the blue truck (not taken from the video footage), which she identified as the vehicle defendant's stepfather drove from the home. R.S. was not asked to identify a picture of the black vehicle or to identify any of the vehicles depicted in any of the disputed surveillance videos used during the trial. No one was asked to do so, ever, in this trial.
The record does reveal that the State asked the federal Secret Service to try to identify the license plate on the rear of the pickup truck depicted in the grainy video footage, but an identification could not be made. The record further reveals that the State did not request either the Secret Service -- or any other lay or expert witness -- to provide any other form of identification of either of the two vehicles highlighted from the video played during the prosecutor's remarks. Neither did the prosecutor have a witness further describe a "Cadillac CTS" beyond R.S.'s description that it is black, four-door, and rounded.
B.
During the trial, the State used various security camera footage feeds from outside the restaurant and several establishments in the area. By way of background, the State's first trial witnesses testified that the videos depicted views from the surveillance cameras of three different establishments: the Texas Fried Chicken & Pizza restaurant, Bobby's (a nearby restaurant), and the **285 Oasis Bar. Initially, defense counsel interposed an objection and the following exchange occurred at sidebar:
[Defense Counsel]: I definitely don't have any objections, I think, to any of the portions they are going to play, but I do want to reserve, just for later, whether every single thing should go in, you know, from -- you know, from like an hour before. You know what I'm saying? The video itself contains a lot of material.
....
Obviously, everything played before the jury in the courtroom is in evidence, but we can talk about the scope later. There might not be any problems.
THE COURT: You can't unring the bell. I don't know what's on the video.
[Defense Counsel]: I know what sections they are going to play, I believe. Right?
[Prosecutor]: It goes on, you can see the people shot. You can see when they entered. You can see the victim enter and you can see the victim fall. You can see the police and you can see the ambulance.
THE COURT: Once you show it to the jury, obviously, you showed it to the jury.
[Defense Counsel]: I don't have a problem with any of that, if you want to move it into evidence.
[Prosecutor]: I want to show him camera by camera.
[Defense Counsel]: In order for you to show anything, you have to move it in *862 evidence. I have no objection, with the caveat we discussed.
THE COURT: As long as you don't have a problem, I don't have a problem.
[Prosecutor]: Okay. V-1.
(Sidebar discussion is concluded.)
THE COURT: V-1 in evidence subject to sidebar.[2]
(Exhibit SV-1, Surveillance Video, marked in evidence.)
Immediately following the discussion, the prosecutor played portions of video from each of the restaurant's sixteen security **286 cameras for the restaurant's manager so he could authenticate the footage.
The owner of the nearby restaurant, Bobby's, was called to authenticate surveillance video from six cameras from his establishment, which was offered into evidence as SV-2. One of the cameras purportedly showed "Lyons Avenue and the cars passing in front of [his restaurant]." Defense counsel stated "Judge, again, no objection." The judge asked, "Subject to the issue we spoke of before?" to which counsel responded "Yes." Then, the owner of the Oasis Bar authenticated security footage from his establishment. That video, marked as SV-2, was on the same disk as the security footage from Bobby's.
During the testimony of investigating officer Detective Holt Walker, the prosecutor played security footage showing the street outside of the Texas Fried Chicken restaurant, including the car during the shooting. The prosecutor then asked that the jury be shown the portion of the video "that shows the cars." The prosecutor had Detective Walker describe the view of the camera, including the direction it faced, naming the streets in view, and identifying the Texas Fried Chicken in the frame. Then, the prosecutor had the tape fast forwarded "to maybe a minute before where the shooting starts happening."
Detective Walker never mentioned the presence of a blue pickup truck or a black Cadillac CTS while describing the video clip from the Texas Fried Chicken restaurant. Nor was he asked about any such vehicles when viewing any other portions of that video. Again, no witness was asked, ever, to identify any of the vehicles depicted in any of the videos. The prosecutor also showed Detective Walker footage from a camera from Bobby's. Again, Detective Walker never mentioned the pickup truck or black Cadillac.
Importantly, the only witness who testified to seeing a blue pickup in front of defendant's home and a black car -- R.S. -- was never asked to identify a picture of the black vehicle that she saw outside defendant's home. R.S. also was never asked to view the **287 videos depicting the cars. However, she was selectively shown a portion of the video from the Texas Fried Chicken restaurant and asked to identify people entering the restaurant as those involved in the earlier fight.
Close examination of this record reveals plainly that R.S. never identified the model *863 of the "black car" in which she viewed defendant leaving the vicinity of his home other than to say she believed it to be a "Cadillac" make, a "newer" model, rounded, not boxy. The State could not dispute this point at oral argument before our Court. R.S. could not identify the model, despite the prosecutor's questioning whether she thought it was a Cadillac CTS model. She never even used the word "sedan." She certainly never identified the black car on the videos as a Cadillac CTS. Nor did she testify the black car on the video was the same car -- or looked similar to the "black car" -- she saw outside defendant's home earlier in the evening. None of that happened because the State did not show the video of the cars to the only witness who said she saw a black car and offered a limited description of what it looked like. Without any witness testimony linking the cars, the State argues it is a reasonable inference that a car described only as black, four-door, rounded, and a Cadillac was both a Cadillac CTS, and the same car depicted in a grainy video. But that is not the summation the State presented.
C.
During summations, the prosecutor asserted that defendant and his accomplice stole the silver Malibu, drove down the street, and fired shots into the Texas Fried Chicken restaurant. After discussing the witness testimony, the prosecutor played portions of the restaurant's surveillance video highlighting the presence of the Malibu.
Then, for nine pages of the thirty-page transcript of the State's summation, the prosecutor did the following. He showed part of the restaurant's security footage, during which he definitively identified two cars in the footage as a "Cadillac CTS" and "a 1993 **288 blue Ford pickup truck." Next, he played the security footage from Bobby's and declared that the video showed the same pickup truck and Cadillac. Last, the prosecutor showed the security footage from Oasis Bar and declared that the video showed the Cadillac:
[Prosecutor]: Cadillac CTS. Cadillac CTS, black Cadillac CTS.
You know what the beauty of the deliberative process is, ladies and gentlemen? We're picking a jury in this courtroom and we're asking people questions at sidebar. "Tell us about yourself." Some of you say, "I like walking in the woods." "I like nature trails." I like this and that. Between the 14 of y'all, somebody knows what a Cadillac CTS looks like. Somebody knows what the outline of a Cadillac CTS looks like.
....
That is a black Cadillac CTS.
....
[Prosecutor]: Cadillac CTS. It's a lot easier to view and identify the Cadillac CTS from the Bobby's video.
Cadillac CTS, pickup truck.
[R.S.] said she saw [defendant's stepfather] leaving in that pickup truck and the defendant was in this car. It was about three and a half minutes before the shooting.
....
[Prosecutor]: Cadillac CTS. Move it up a little bit.
Cadillac CTS. You can't see the whole thing. You can't see the license plate. You can't see the defendant driving in there. But [R.S.], that's what she testified about. The most neutral witness in this case.
[ (emphases added).]
None of that evidence was highlighted or even mentioned during the State's opening, or by any witness, as previously described. None of the identifications the *864 prosecutor made in the video had been made by any witness. The jury did not have a photo of defendant's black car, or a generic photo of a Cadillac CTS, to which they could compare the car in the video. Nevertheless, as the transcript reveals, the prosecutor made repetitive declarative statements during his summation that the video depicted "the Cadillac CTS" or "the CTS" and the "1993 blue Ford pickup truck" attributed to defendant and his stepfather, respectively. That would have been powerful evidence if offered by a witness and tested under cross-examination because it would have **289 placed defendant in close temporal proximity to the scene of the shooting that took place minutes later and provided strong evidence that defendant was guilty of the carjacking. Without a witness, the prosecutor simply stated a theory as fact.
Following the State's summation, defense counsel made a motion for a mistrial alleging that
[t]he Prosecutor just played a piece of tape and testified about it. There was no prior testimony and, in fact, he also misrepresented testimony. So he played a piece of tape where he purported to testify that the blue pickup truck in the tape was the same blue pickup truck that is owned by my client's stepfather. No one had testified in the case that, in fact, the blue pickup truck on that video was my client's stepfather's truck ....
Additionally, the Prosecutor testified that a black car -- and that's all I could tell from the video, is that it's a black car -- is a Cadillac CTS. There was no witness in this case who testified that that black car is a Cadillac CTS.
[ (emphasis added).]
The court denied the motion, finding that the footage was admitted evidence and the prosecutor's comments were fair comment on the evidence. The court also refused to give a curative instruction regarding the prosecutor's comments about the vehicles and their association with defendant. Instead, the court relied on the standard jury charge that included: "Arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence. Although the attorneys may point out what they think is important in this case, you must rely solely upon your understanding during the trial."
During deliberations, the jury sent a note stating: "We would like to see: The tape before the shooting which shows the blue truck and the black car. It was only shown by the Prosecutor at the closing statement. Can/may we see this again? Can it count as evidence?" Over defense counsel's objection, the judge determined the videos were in evidence and could be viewed again and considered as evidence.
Before the videos were played for the jury, defense counsel reiterated the objection that the videos were not in evidence. The judge noted the objection, and the videos were played for the jury.
**290 The jury acquitted defendant on the murder charge but found him guilty of conspiracy to commit carjacking, carjacking, conspiracy to commit murder, aggravated manslaughter, unlawful possession of a handgun, possession of a firearm with a purpose to use it unlawfully, three counts of attempted murder, and various aggravated assaults. The court sentenced defendant, in the aggregate, to two consecutive terms of thirty years of imprisonment with an eighty-five percent parole disqualifier under the No Early Release Act.
III.
In my view, the prosecutor's remarks crossed the line from fair comment on the evidence in the record into impermissible *865 territory. First, the comments inserted information not in the record, by referring to the truck in the videos as "the 1993 blue Ford pickup," and repeatedly calling the black car the "CTS" when no one had identified the black car outside defendant's home in that specific a manner. See State v. Feaster, 156 N.J. 1, 56, 61-62, 716 A.2d 395 (1998) (noting that the prosecution may not "provide ... missing pieces" of evidence). And, no one identified the black car in the grainy videos as a Cadillac CTS. We do not know if any of the witnesses at trial could have done so; all we know is that no witness was asked to make an identification, and none did. The record does not reveal the reason that question was never asked.
Worse, the prosecutor actually miscast R.S.'s testimony when he summarized it during summation. While showing the video to the jury, the prosecutor stated,
[R.S.] says cars were coming and going, the defendant left three times. The first time he left in the pickup truck with his stepfather. The second time -- I can't remember exactly what she said, but the third time she said he got into a black Cadillac CTS and the black Cadillac CTS followed the pickup truck.
With respect to that black car depicted in the video, the prosecutor repeatedly declared that it was a Cadillac CTS. Aside from the prosecutor miscasting evidence in the record, the jury could have perceived that he knew something they did not. That is impermissible. See Frost, 158 N.J. at 85, 727 A.2d 1 (finding **291 reversible error where a prosecutor's comments referenced police reports not introduced into evidence that bolstered the credibility of an officer-witness). Prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). "[I]mproper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Ibid.
Second, to the extent that the State urges us to view the comments not as declarative statements but rather as suggestions for the members of the jury to draw their own deductions or inferences from the videos, I do not believe that the lay persons of the jury would know that the grainy, short snippets in the videos depicted a Cadillac CTS. It is too much to constitute a fair inference because it required prior knowledge, something that the State's case did not provide to the jury through any lay or expert testimony commenting on what the videos depicted with respect to the black car. The prosecutor noted as much when he claimed that "[s]omebody knows what the outline of a Cadillac CTS looks like."
IV.
Trials involve a careful, factually supported balancing of different interests. For me, the institutional interests in a conviction achieved through a fair trial should align with the individual's interest in a fair trial. That did not happen here.
In my view, the prosecutor's summation transgressed permissible lines expected of the State in the effort to secure a conviction. In this case, the prosecutor gave testimony rather than related testimony in summation. Worse, the manner and timing of this discussion of evidence -- which had not been addressed at all before in the State's case -- had the effect of ambushing defendant. By not raising the point sought to be gleaned from the videos until summation, the State prevented defendant from any opportunity to rebut the "evidence."
**292 It is certainly permissible for the State to highlight particular evidence during *866 summation. For example, the State could take words from a single document out of hundreds admitted in evidence in bulk and present the key language in large type on a poster board or a power point presentation to the jury. But the difference is that the document is clear-cut, easily perceived evidence. This grainy surveillance video is not of the same ilk. It required translation or narration, not previously testified to by any witness, for the jury to perceive what the prosecutor declared the video depicted.
Moreover, the prosecutorial error was impactful.
A key strand of the State's case was that whoever committed the carjacking also committed the shooting. The shooting occurred shortly after the carjacking; the videotape depicts a gun shooting from a car that resembled the carjacked vehicle as it passes the restaurant; shots were heard by the carjacked victims shortly after the carjacked vehicle sped away; and spent shells matching the bullets used in the shooting were found in the recovered vehicle. Implicating defendant in the carjacking was a necessary part of the prosecution's case.
The video segments shown to the jury during the closing and the prosecutor's comments regarding those videos were important to connect defendant to the carjacking. The prosecutor alleged that the video demonstrates that defendant was only a few blocks away minutes before the carjacking occurred. The black car that the prosecutor declared was a "Cadillac CTS" is shown turning down a street leading to the location of the carjacking. The summation purported to show, on video, defendant on his way to commit the carjacking within minutes of the commission of that crime.
The carjacking victim was unable to identify defendant immediately after the incident. The victim identified defendant only when police showed her his photo for a second time. That identification, and the video shown during summation, were two of the most important pieces of evidence connecting defendant to the carjacking.
**293 The remaining evidence at trial suggested that whoever committed the carjacking almost certainly committed the shooting.
Without the prosecutor's testimony regarding the video during summation, I am not convinced, beyond a reasonable doubt, that the outcome of the trial would have been the same. This evidence and how it unfolded in the State's final remarks to the jury, which the defense had no opportunity to rebut, placed defendant in close temporal proximity to the shooting, bolstered the State's theory of motive, and, critically, connected defendant to the carjacking. The error was not harmless in my estimation.
Accordingly, I disagree with my colleagues in the majority and respectfully dissent. I would affirm the Appellate Division's reversal of this conviction and remand for a new trial.

When the prosecutor refreshed R.S.'s recollection with her prior statement, she stated that she called it a "black caddy because that's what it looked like to me."

To perform its review function in this setting, an appellate court should have the benefit of a record that precisely reveals the evidence admitted at trial as well as clear and timely rulings by the trial court on counsels' objections while the record is developed. Not only do counsel have the obligation to state specifically the grounds of their objections and trial motions in accordance with Rule 1:7-2, but the court, particularly in ruling on motions, is obliged to state timely its reasons "so that counsel and an appellate tribunal may be fully informed." McCann v. Biss, 65 N.J. 301, 304 n.2, 322 A.2d 161 (1974).
A record developed with precision advances confidence and eases the appellate review function. This record is not a model for that ideal. That said, I agree with the majority that this sidebar exchange does not constitute a preserved defense objection to the admission of the evidence. Ante at 272-73, 209 A.3d 854-55.