**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3310-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOHN L. WILLIAMS, a/k/a
HASSAN WILLIAMS,

     Defendant-Appellant.

_____

Argued February 12, 2024 – Decided February 22, 2024

Before Judges Mawla, Marczyk, and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 21-07-0852.

Susan Lee Romeo, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Susan Lee Romeo, of counsel and on the brief).

Cheryl L. Hammel, Assistant Prosecutor, argued the cause for respondent (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel J. Marzarella, Chief Appellate Attorney, of counsel; Cheryl L. Hammel, on the brief).

PER CURIAM

Defendant John L. Williams appeals from a March 21, 2022 conviction for: third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1) (count one); second-degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and -5(b)(2) (count two); third-degree possession of heroin and fentanyl, N.J.S.A. 2C:35-10(a)(1) (count three); and third-degree possession of heroin with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and -5(b)(3) (count four). He also challenges his sentence. We affirm.

On November 10, 2020, Lakewood Police Detective Matthew Richardson, Detective Sergeant Nathan Reyes, and Detective Kevin Donnelly were in an unmarked police vehicle on assignment with the street crimes unit near Second Street and Clifton Avenue. Around 8:30 p.m., Detective Richardson observed defendant, who was wearing a traffic vest and sunglasses, walking on the north side of Second Street. The detectives then saw Christopher Kiraly walking toward defendant.

Defendant and Kiraly met on the south side of Second Street and began to walk northbound together as if engaged in a conversation. The two walked to a municipal parking lot between Second Street and Third Street and walked in between parked cars. Detective Richardson testified defendant and Kiraly

2

"stayed behind the vehicle for . . . at least thirty seconds, during which [Kiraly] continued to poke his head out numerous times." The detectives then watched Kiraly leave, "scanning the area and . . . walking away in a quick manner, and he had his left hand within his left pants pocket." Defendant had a "trash picker" in his hand. Detective Richardson did not observe defendant picking up any trash with the device.

Detective Richardson approached defendant, who was still in the parking lot, and smelled the odor of raw marijuana. When the detective informed defendant he was going to search him, defendant stated: "[Y]ou got me. You got me dirty." Detective Richardson testified the search of defendant's fanny pack and clothing yielded

> a Ziploc bag that contained approximately sixteen grams of . . . an off-white rock-like substance, another plastic bag that contained approximately one gram of a[n] off-white rock-like substance, a plastic bag that had . . . approximately one gram of a white powder substance, a yellow vial that [] contain[ed] a white powder substance, a knotted plastic bag containing a green vegetative substance. There was a .01 digital scale or one cent, . . . three bricks of wax folds that contained a beige powder. There was a bundle . . . of wax folds that had a red stamp on it that also had beige powder within [it]. There w[ere] five loose wax folds that had a red stamp and had beige powder within it. There were several clear plastic gloves . . . [and] about eight clear plastic bags. And, there was $1,259[] in assorted U.S. currency . . . .

A-3310-21

The detective also found a folded one-dollar bill with a white powder substance inside it. Defendant was arrested following the search.

Detective Richardson testified he was patrolling the area because it is "plagued with a lot of quality[-]of[-]life issues, including open-air drug dealing, open-air drug possession." At a later sidebar, and while the jury was on break, defense counsel stated she "did not object [to this comment] at the time, because it was kind of already out before [she] could object and [she] didn't want to draw attention to it . . . ." When the jury returned, the trial judge instructed them as follows:

> During the trial this morning there was some testimony about the area in downtown Lakewood where this incident . . . occurred. I instruct you that the area of the incident is not evidence of guilt in this case. Further, the mere presence of anyone, including the defendant or anyone else, in a particular area in downtown . . . Lakewood is likewise not evidence of guilt or innocence and you should not consider it as such.

The State called Ocean County Prosecutor's Office Detective Olga Brylevskaya "as an expert in the field of narcotics, including the practices, methods, and techniques of those that are involved in the sale, distribution, or possession with intent to distribute narcotics." Her expertise was based on her interview of over one hundred people involved in narcotics distribution,

4

specifically heroin and cocaine, over one hundred people who are drug users, and approximately fifty people who were confidential sources regarding drug distribution.

She testified a typical drug sale interaction involved "a quick interaction," which is "hand to hand," and there is an "exchange [of] money for . . . drugs." She explained interactions between drug dealers and buyers are "very brief and quick, because the conversation . . . happened before they met," including agreement on price and quantity.

Detective Brylevskaya testified a drug dealer would have bags to package the drugs, glassine paper folds, a scale to weigh quantities of drugs, and gloves. They would also have "large quantities of money" in different increments to quickly make change for buyers.

She explained heroin users typically carry needles, spoons, cotton balls to filter the heroin, "bottle caps to mix the water and the heroin so they can shoot it up with the syringe," tourniquets, or straws for inhalation. A user "would typically have between a bundle up to a brick," or "one wax fold" of heroin on them, "but not more." This is because

> users know how addictive heroin is. They would be afraid if they had a greater quantity they would use it at once[,] . . . which would many times lead to an overdose. Another reason is that . . . a smaller amount

5

of drugs . . . would be easier to dispose of it. If they were approached by law enforcement they can swallow it or throw it to the ground, so that it wouldn't be noticed. Another reason is a lot of users don't have the economic[] means, don't have the money to buy a lot of the drugs. A lot of the users [are] addicted to the opioids, which is the heroin. They . . . don't want to be going through withdrawals. So, they don't want to get dope sick, so they would only use it and then — to prevent the withdrawals, but they don't want to be exposed to a lot of it.

According to Detective Brylevskaya, crack and cocaine users would usually have "a half a gram to a gram, the most is 3.5 grams, which is called an eight ball" of drugs on their person. She gave a similar explanation as the one about heroin regarding why a user would have a small quantity of crack and cocaine on their person and what dealers would carry on their person.

Defendant testified he struggled with drug addiction since his youth and participated in rehabilitation programs intermittently. At the time of his arrest, he was living at a Lakewood motel and picked up trash, changed trash can liners, and did other jobs in exchange for a reduction in rent. He worked "around the clock," always wore a yellow reflective vest, and carried around gloves, bags, and the trash stick. He relapsed because he thought he was going to have a baby but found out he was not the father.

6

Defendant testified that on the day of his arrest he had cocaine and heroin, which he bought for personal use from a dealer in Asbury Park. He bought a scale at a convenience store to verify the amount of drugs he was buying. He bought a pipe and a "choy"[1] to smoke crack. He sniffed powder cocaine throughout the day, went back to the motel, and began changing trash bin liners.

Defendant went to the liquor store to play lottery tickets and took his drugs and paraphernalia with him so his boss would not find anything in his motel room. He also took the cash with him, which he said was from a stimulus check he received during the COVID-19 pandemic. He put the pipe into a bag that had food in it because the pipe was hot from use and put the rest of the contraband in the crotch area of his underpants. Defendant testified he always kept his contraband in his underpants. He told the jury: "I wear two pair of underwear, the same underwear I got on now . . . ."

Defendant encountered a friend on his way to the liquor store and ate some shrimp with her. He kept walking, but then decided to return to the motel because he forgot his wallet. He testified he then encountered Kiraly, whom he recognized from a group of laborers that waited in the mornings in that area for

---

[1] Detective Brylevskaya explained choy is a type of metal filter used to smoke crack through a pipe.

day jobs. Defendant claimed he saw the unmarked police vehicle and knew it was police. Kiraly followed defendant and asked to speak with him, but defendant said he was trying to get back to the motel as quickly as possible to get his wallet and use the bathroom.

Defendant walked through the parking lot between Second Street and Third Street. He urinated between two cars in the lot and told Kiraly "I can't talk to you right now," and Kiraly "kept moving." When Kiraly walked away, defendant said he vomited and fell to his knees. He testified he became sick due to a combination of cocaine, alcohol, and the shrimp he ate. The police then arrived.

On cross-examination, the prosecutor questioned defendant about the day of his arrest and the following exchange took place:

> [PROSECUTOR: Y]ou were wearing two pairs of underwear; is that correct?
>
> [DEFENDANT:] Yes.
>
> [PROSECUTOR:] And you usually wear two pairs of underwear so there's nothing odd about that; right?
>
> [DEFENDANT:] No, I only wear them when I'm concealing drugs.
>
> [PROSECUTOR:] Okay. Drugs in this type of quantity?

[DEFENDANT:] Yes, they're stretchy. I have them on today.

[PROSECUTOR:] Right. You have them on today?

[DEFENDANT:] The same exact ones I got arrested . . . .

[PROSECUTOR:] So, are you concealing . . . this amount of drugs on you right now?

. . . .

[Y]ou only wear two pairs of underwear when you're concealing drugs you said; correct?

[DEFENDANT:] Correct.

[PROSECUTOR:] So do you have drugs on you right now?

Defense counsel objected, and the record reflects a sidebar occurred and the jury took a break, but the judge's ruling on the objection was not transcribed. However, when cross-examination resumed, the State did not continue with this line of questioning.

The intake nurse at Ocean County Jail the night of defendant's arrest testified she conducted his medical intake at 2:50 a.m. She explained defendant tested positive for marijuana and cocaine.

Following the guilty verdict, the State moved for the imposition of an extended term of imprisonment, pursuant to N.J.S.A. 2C:43-6(f). The trial judge

9

found aggravating factor three, N.J.S.A. 2C:44-1(1)(3), the risk of re-offense; six, N.J.S.A. 2C:44-1(1)(6), the nature and extent of defendant's prior record and the seriousness of those offenses; and nine, N.J.S.A. 2C:44-1(1)(9), the need to deter defendant and others from violating the law. The judge also found mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11), the imprisonment of defendant would entail excessive hardship to himself or his dependents.

The trial judge placed "heavy weight" on aggravating factors three, six, and nine. He merged count one into count two and count three into count four. He sentenced defendant on count two to an extended term of imprisonment of seventeen years with eight and one-half years of parole ineligibility. He sentenced defendant to a concurrent term of five years flat on count four. Defendant received 561 days of jail credit against his sentence, and the judge assessed various fee, fines, and penalties.

Defendant raises the following points on appeal:

> POINT I   DEFENDANT'S CONVICTIONS MUST BE REVERSED BASED ON PROSECUTORIAL MISCONDUCT:   1) IN VIOLATION OF THE COURT'S PRIOR INSTRUCTION, THE PROSECUTOR ELICITED TESTIMONY FROM THE ARRESTING OFFICER DESCRIBING THE AREA AS ONE WITH "OPEN-AIR DRUG DEALING" AND "OPEN-AIR DRUG POSSESSION," AND 2) THE PROSECUTOR'S CROSS-EXAMINATION DENIGRATED DEFENDANT AND IMPROPERLY

10

DISPARAGED THE DEFENSE BY REPEATEDLY ASKING HIM WHETHER HE WAS CONCEALING DRUGS IN HIS UNDERWEAR WHILE HE WAS TESTIFYING (partially raised below).

1. The Prosecutor Committed Misconduct When She Elicited Testimony From The Arresting Officer On The Area's Criminal Characteristics, Despite The Court's Warning To Avoid Any Testimony That It Was "A High-Crime Area" And The Officer's Opinion Regarding His Observations.

2. The Prosecutor Committed Misconduct When She Denigrated Defendant And Disparaged The Defense By Asking Him Repeatedly If He Had Drugs In His Underwear While Testifying.

POINT II   IT WAS PLAIN ERROR TO ALLOW THE EXPERT WITNESS TO TESTIFY REGARDING THE USUAL CONDUCT AND STATE OF MIND OF DRUG USERS AND ADDICTS, WHEN SHE WAS NOT QUALIFIED AS AN EXPERT WITNESS IN THAT AREA, SHE ADMITTED HER LACK OF QUALIFICATIONS TO ANSWER SUCH QUESTIONS, AND SHE PROVIDED NO BASIS TO SUPPORT HER NET OPINIONS (not raised below).

POINT III DEFENDANT'S MANDATORY MINIMUM PERIOD OF PAROLE INELIGIBILITY ON COUNT TWO MUST BE VACATED BECAUSE THE STATE REQUESTED, AND THE COURT IMPOSED, A MANDATORY MINIMUM TERM ON COUNT TWO, N.J.S.A. 2C:35-5(a) AND (b), IN VIOLATION OF ATTORNEY GENERAL DIRECTIVE 2021-4, WHICH REQUIRES PROSECUTORS TO WAIVE MANDATORY

11

MINIMUM TERMS FOR CONVICTIONS OF NON-VIOLENT DRUG OFFENSES, INCLUDING N.J.S.A. 2C:35-5.

I.

In Point I, defendant contends there was prosecutorial misconduct because the State improperly elicited testimony he was in a high crime area known for drugs. He argues the testimony prejudiced the outcome of his case because the State had no actual evidence of a drug transaction or that defendant intended to engage in a drug transaction. Defendant notes he moved to exclude the testimony about the "high crime area" and the judge ruled Detective Richardson could only testify about his observation of Kiraly but could not opine on his observations or state that he knew Kiraly from prior interactions with law enforcement. Despite the judge's ruling, the prosecutor asked Detective Richardson why he was patrolling the area and the detective responded it was because the area had "quality of life" issues including "open-air drug dealing" and possession. Defendant argues this testimony improperly bolstered the State's case and unduly prejudiced the defense's explanation why defendant was in the area and had drugs in his possession.

Defendant asserts the prosecutor also committed misconduct when she questioned him about having drugs on his person during trial. He argues the

prosecutor knew her questions had no basis in fact and were neither a fair comment on the evidence nor a reasonable avenue of cross-examination. Further, "the prosecutor's questions improperly mocked defendant's efforts to explain his actions to the jury and denigrated his defense on a critical factual issue that also related to his and [Detective] Richardson's credibility." Indeed, defendant's testimony that he carried drugs in his underpants contradicted Detective Richardson's claim he found the drugs in defendant's pockets. The prosecutor's questions prevented the jury from crediting defendant's testimony that the drugs were not accessible for distribution on the street because they were in his underpants.

Prosecutorial misconduct justifies reversal where the misconduct was "so egregious as to deprive the defendant of a fair trial." State v. Smith, 167 N.J. 158, 181 (2001) (quoting State v. Frost, 158 N.J. 76, 83 (1999)). "In deciding whether prosecutorial conduct deprived a defendant of a fair trial, 'an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred.'" State v. Williams, 244 N.J. 592, 608 (2021) (quoting Frost, 158 N.J. at 83). "Factors to be considered in making that decision include, '(1) whether defense counsel made timely and proper objections to the improper remarks; (2)

whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them.'" Ibid. (quoting Frost, 158 N.J. at 83).

Detective Richardson's testimony about the crime in the area was to explain why police were present the day of defendant's arrest, not why defendant was stopped. Defendant does not challenge the reasons for the stop on this appeal. The testimony did not contravene the judge's pre-trial ruling because the ruling barred the detective from telling the jury he knew Kiraly, which the detective never discussed. Moreover, the trial judge promptly instructed the jury the area of the incident was not evidence of defendant's guilt. "One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions." State v. Burns, 192 N.J. 312, 335 (2007) (citing State v. Nelson, 155 N.J. 487, 526 (1998)). The record does not establish the jury ignored the judge's curative instruction in this case.

The prosecutor's questions during defendant's cross-examination regarding his underpants were beyond the scope of the State's case. However, defendant opened the door when he volunteered that he only wears two pairs of underwear "when [he's] concealing drugs," and then said he was wearing the same underwear he uses to conceal drugs in court. Regardless, defense counsel

14

promptly objected, and the record reflects the State abandoned this line of questioning.

Having reviewed the record and considered the tenor of the case, we are unconvinced these instances were sufficiently egregious such that they deprived defendant of a fair trial. Both Detective Richardson's testimony and the objectionable portion of the State's cross-examination were limited and not repeated once the defense objected. We discern no reversible error.

## II.

In Point II, defendant contends it was plain error to allow Detective Brylevskaya to testify about the state of mind of drug users because the testimony exceeded her scope of expertise. Moreover, the detective could not opine whether defendant intended to distribute the drugs in his possession. Defendant claims the detective's testimony that addicts do not buy large amounts of drugs for fear of overdose lacked a basis and was a net opinion. Additionally, the trial judge compounded the error by issuing a final jury instruction, which stated the detective "was called by the State as an expert in the field of narcotics" including "personal use" because the detective admitted she was not an expert in the personal use of narcotics.

We defer to a trial judge's evidentiary rulings "absent a showing of an abuse of discretion, i.e., there has been a clear error in judgment." State v. Singh, 245 N.J. 1, 12-13 (2021) (quoting State v. Nantambu, 221 N.J. 390, 402 (2015)). On appeal, we do not substitute our judgment "for that of the trial court, unless the trial court's ruling was so wide of the mark that a manifest denial of justice resulted." Id. at 13 (internal quotation marks omitted) (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

"When a defendant fails to object to an error . . . at trial, we review for plain error. Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). Reversal is warranted only where there is a "reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached." Ibid. (alteration in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)). "The mere possibility of an unjust result is not enough." Ibid.

Expert testimony must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Polzo v. Cnty. of

Essex, 196 N.J. 569, 583 (2008) (quoting State v. Townsend, 186 N.J. 473, 494 (2006)). "The net opinion rule . . . 'forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (quoting Polzo, 196 N.J. at 583). "To avoid a net opinion, the expert must 'give the why and wherefore' that supports the opinion.'" Ehrlich v. Sorokin, 451 N.J. Super. 119, 134 (App. Div. 2017) (quoting Townsend, 221 N.J. at 54).

At the outset, we note defendant did not object to Detective Brylevskaya's testimony. Regardless, the admission of her testimony was neither an abuse of discretion nor clearly capable of producing an unjust result. Her opinion was grounded in her personal observations and vocational experience. She explained why drug dealers carry certain amounts of contraband and equipment and why the drugs and paraphernalia carried by users was different. She did not opine on defendant's state of mind. Furthermore, the State's case included other evidence pointing to the fact defendant was distributing rather than only consuming drugs on the day in question. As we noted, a search of defendant's person produced a large sum of money, drugs, empty baggies, and a scale. Defendant's remaining arguments under this point lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Finally, in Point III, defendant challenges his sentence on count two on grounds the State violated an Attorney General Directive that prosecutors must waive mandatory minimum terms for all non-violent drug crimes pursuant to N.J.S.A. 2C:35-12.[2] He argues the State ignored the Directive, which has the force of law, when it sought an extended term of twenty years imprisonment with a mandatory ten years on count two.

We review a sentence "in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). Under this standard, we do "not substitute [our] judgment for that of the sentencing court." Ibid. "[T]he deferential standard of review applies only if the trial judge follows the [Criminal] Code and the basic precepts that channel sentencing discretion." State v. Case, 220 N.J. 49, 65 (2014).

Directive 2021-4 explains there are eighty crimes for which State law requires judges to impose a longer period of parole ineligibility than for other crimes, including N.J.S.A. 2C:35-5, the manufacture, distribution, or dispensing of a controlled dangerous substance (CDS). Law Enf't Directive No. 2021-4, at

---

[2] Off. of the Att'y Gen. Law Enf't Directive No. 2021-04, Directive Revising Statewide Guidelines Concerning the Waiver of Mandatory Minimum Sentences in Non-Violent Drug Cases Pursuant to N.J.S.A. 2C:35-12 (Apr. 19, 2021).

2.  The Directive explains N.J.S.A. 2C:35-5, among other offenses, differs from other drug crimes because

> the period of mandatory parole ineligibility can be waived pursuant to a "negotiated agreement" between the defendant and the State.  Under N.J.S.A. 2C:35-12 ("Section 12"), the parties can enter into an agreement—before or after conviction—that provides for a shorter period of parole ineligibility, among other possible sentence modifications.  In addition, Section 12 prohibits the sentencing judge from imposing a lesser sentence or shorter parole disqualifier than is provided for under the terms of the agreement.
>
> [Id. at 2-3.]

Therefore, the Directive requires prosecutors to offer defendants convicted after trial "the opportunity to enter into an agreement prior to sentencing" pursuant to N.J.S.A. 2C:35-12, that imposes ordinary parole eligibility, including application of "commutation, minimum custody, and work credits earned while in custody."  Id. at 7.  Notwithstanding this instruction, the Directive states a prosecutor can still seek an extended term under N.J.S.A. 2C:35-12, and the sentencing court retains authority to impose a discretionary period of parole ineligibility pursuant to N.J.S.A. 2C:43-6(b).  Id. at 7-8.

N.J.S.A. 2C:35-12 provides:

> Whenever an offense defined in this chapter specifies a mandatory sentence of imprisonment which includes a minimum term during which the defendant shall be

19

ineligible for parole, a mandatory extended term which includes a period of parole ineligibility . . . , the court upon conviction shall impose the mandatory sentence . . . unless . . . in cases resulting in trial, the defendant and the prosecution have entered into a post-conviction agreement, which provides for a lesser sentence, period of parole ineligibility or anti-drug profiteering penalty. The negotiated plea or post-conviction agreement may provide for a specified term of imprisonment within the range of ordinary or extended sentences authorized by law, a specified period of parole ineligibility, a specified fine, a specified anti-drug profiteering penalty, or other disposition.

Parole ineligibility is further addressed in N.J.S.A. 2C:43-6(b), which provides, in pertinent part:

As part of a sentence for any crime, where the court is clearly convinced that the aggravating factors substantially outweigh the mitigating factors, as set forth in [N.J.S.A. 2C:44-1(a) and (b)] . . . the court may fix a minimum term not to exceed one-half of the term set pursuant to [N.J.S.A. 2C:43-6(a)] . . . during which the defendant shall not be eligible for parole . . . .

N.J.S.A. 2C:43-6(f) states: "A person convicted of manufacturing, distributing, dispensing or possessing with intent to distribute any dangerous substance or controlled substance . . . shall upon application of the prosecuting attorney be sentenced by the court to an extended term . . . ." Further, "[t]he term of imprisonment shall, except as may be provided in N.J.S.[A.] 2C:35-12, include the imposition of a minimum term." Ibid.

The Directive does not mandate a waiver of mandatory minimum sentences or prohibit the State from seeking an extended term under N.J.S.A. 2C:35-12. The State and the defense did not enter an agreement. Moreover, the Directive does not dictate a trial judge's discretion to impose a period of parole ineligibility pursuant to N.J.S.A. 2C:43-6(b), because it is not applicable to the judiciary.

Defendant had an extensive criminal history, including eight prior convictions for possession of CDS with intent to distribute, CDS distribution in a school zone, and possession of CDS with intent to distribute while in or within 500 feet of public housing. At sentencing, the trial judge recounted defendant had many more convictions for various offenses beyond the eight CDS convictions. As we noted, the trial judge found the aggravating factors substantially outweighed the mitigating factors, justifying the imposition of parole ineligibility. Under these circumstances, defendant's sentence does not "shock the judicial conscience." Case, 220 N.J. at 65 (quoting State v. Roth, 95 N.J. 334, 365 (1984)).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3310-21