SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Gerald W. Butler (A-47-24) (090237)**

**Argued October 21, 2025 -- Decided February 25, 2026**

**JUSTICE NORIEGA, writing for a unanimous Court.**

In this appeal, the Court considers defendant Gerald W. Butler's challenge to his conviction for controlled dangerous substances (CDS) offenses on the basis of prejudicial prosecutorial comments and the admission of evidence Butler contends portrayed him as a violent, organized criminal.

Cumberland County Prosecutor's Office Organized Crime Bureau (OCB) launched an investigation in response to a series of shootings in Millville. Butler was not linked to those underlying incidents of violence. He became a subject of the investigation only after surveillance of wiretapped lines captured a phone call during which the participants discussed facilitating a firearm purchase. Police obtained a warrant and searched an apartment they had seen Butler entering. They found heroin, cocaine, drug paraphernalia, and two revolvers. The leaseholder of the apartment initially attributed one of the revolvers to Butler but later recanted. Butler was arrested.

Before trial, defendant moved to sanitize references to search warrants. The court instructed the State to use the phrase "lawful search" and not to mention "search warrant." The State agreed. Defendant also sought to preclude references to the OCB. The State offered to craft a limiting instruction, which Butler considered but never pursued. During opening statements, the prosecutor made multiple references to The Wire, a television show widely known for its portrayal of organized crime. Defendant's immediate objection was overruled.

Throughout trial, the State's witnesses, many of whom identified themselves as members of the OCB, made references to gun violence, weapons trafficking, and organized criminal activity. Despite defense objections, the State questioned witnesses about the search itself, resulting in repeated references to the "search warrant." Butler was acquitted of weapons offenses but convicted of CDS offenses.

The Appellate Division affirmed defendant's convictions. The Court granted Butler's petition for certification, limited to consideration of: (1) the State's

1

references to "The Wire; testimony elicited by the State that [Butler] was the subject of a search warrant; and references to the 'Organized Crime Unit,' gun violence, and trafficking in the City of Millville; and [(2)] whether the cumulative effect of the purported errors deprived [Butler] of a fair trial."  260 N.J. 307 (2025).

**HELD:**  None of the individual errors that Butler alleges require that his convictions be overturned, but the accumulation of errors in this case deprived him of his constitutional right to a fair trial.

1.  In assessing whether a defendant's constitutional right to a fair trial has been compromised by improper testimony or argument, the question is whether the challenged conduct had the capacity to prejudice the jury and thereby undermine the fairness of the proceedings.  Where multiple errors are alleged, the Court considers whether their cumulative effect rendered the proceedings fundamentally unfair. (pp. 17-20)

2.  An opening statement must be limited to facts the prosecutor intends to prove by competent evidence.  Here, the prosecutor invoked The Wire, a television series widely known for its portrayal of organized crime, violence, intimidation, and murder, thus analogizing the events leading to the Millville investigation to a large-scale violent criminal enterprise.  The reference invited jurors to associate defendant with violent criminal conduct -- an association untethered to the evidence that created a risk of distracting the jury from its obligation to assess guilt based solely on the facts presented at trial.  The Court has previously cautioned against relying on pop culture references at trial.  See State v. Williams, 244 N.J. 592, 615 (2021).  The State may not bolster its case with powerful or inflammatory imagery that supplants the jury's role to evaluate actual proof.  Here, however, the mention of the show was isolated; the jury was instructed to base its verdict solely on the evidence before it; and the substantial evidence of Butler's guilt presented at trial makes it unlikely that the outcome turned on this improper analogy.  Although unnecessary, the reference, by itself, did not clearly have the capacity to lead to an unjust result; it does not, therefore, warrant reversal.  (pp. 21-23)

3.  The Court next reviews the prosecutor's repeated extra-evidentiary references.  Police may explain the context and genesis of an investigation where needed; however, such background testimony cannot be used as a disguised means of suggesting a defendant's propensity for crime or involvement in unrelated criminal conduct.  The charged offenses form the prism through which the State must prove its case.  By constructing a narrative replete with extra-evidentiary references to rampant violence, gun trafficking, and massive conspiracies, the State risked misleading the jury.  Although the references were thus improper, other safeguards rendered the risk harmless:  the evidence presented against defendant on the charged offenses was substantial; defense counsel had opportunities to object; and the trial

2

court provided instructions limiting the jury's consideration to the evidence on the specific charges. (pp. 24-27)

4. The prosecutor's repeated elicitation of the search warrant and the testimony that defendant was its target risked precisely the prejudice that the Court identified in State v. Cain: "A prosecutor . . . may not repeatedly mention that a search warrant was issued by a judge if doing so creates the likelihood that a jury may draw an impermissible inference of guilt." 224 N.J. 410, 435 (2016). However, Cain also made clear that reversal is not automatic. See id. at 436-37. Here, the jury acquitted Butler of the gun charge, indicating that, even in the face of repeated improper references, the panel weighed the evidence against Butler and was not improperly swayed. Although the trial court erred in overruling defense objections, and the State should not have repeated the same mistake after agreeing to the contrary, these errors, standing alone, likely satisfy the harmless error standard. (pp. 27-31)

5. The references to the OCB are fundamentally different from the other contested remarks. Use of code and unit names reflects routine law enforcement practice. Defendant did not pursue a limiting instruction. The Court discerns no plain error warranting reversal. (pp. 31-32)

6. Although no single error alone requires reversal, the Court cannot conclude, beyond a reasonable doubt, that the aggregate effect of these improper references did not deprive Butler of a fair trial. The overall impact of repeated analogies to organized violence, improper emphasis on Butler being the "target" of a judicially sanctioned search warrant, and rhetorical scaffolding extending beyond the facts of the case was inconsistent with Butler's right to have his guilt or innocence evaluated solely based on admissible evidence. (pp. 33-35)

**REVERSED and REMANDED for a new trial.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and HOFFMAN join in JUSTICE NORIEGA's opinion.**

3

State of New Jersey,

Plaintiff-Respondent,

v.

Gerald W. Butler,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
| --- | --- |
| October 21, 2025 | February 25, 2026 |

Alison Gifford, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Alison Gifford, of counsel and on the briefs).

Stephen C. Sayer, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Stephen C. Sayer, of counsel and on the briefs).

Ezra D. Rosenberg argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Ezra D. Rosenberg, Rebecca Uwakwe, and Jeanne LoCicero, on the brief).

Dillon J. McGuire submitted a brief on behalf of amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; Dillon J. McGuire, on the brief).

JUSTICE NORIEGA delivered the opinion of the Court.

This appeal arises from defendant Gerald W. Butler's conviction for controlled dangerous substances (CDS) offenses following a multi-agency investigation known as "Operation That's All Folks," spearheaded by the Cumberland County Prosecutor's Office Organized Crime Bureau (OCB). Butler challenges his convictions on the basis of prejudicial prosecutorial comments and the admission of evidence he contends portrayed him as a violent, organized criminal -- a depiction unsupported by the trial record.

Although we do not find any of the individual errors that Butler alleges require his convictions be overturned, we conclude that the accumulation of errors in this case deprived him of his constitutional right to a fair trial. We therefore reverse the judgment of the Appellate Division and remand for a new trial.

I.

The following details of the investigation that led to Butler's arrest, prosecution, and trial are derived from the record of the trial court proceedings.

2

The Cumberland County Prosecutor's Office OCB launched "Operation That's All Folks" in response to a series of shootings in Millville with the stated objective of curbing gun violence and weapons trafficking in the city. Police obtained wiretap authorizations for the phones of three suspected individuals believed to be involved in the violence. Butler was not initially among them, nor was he linked to those underlying incidents of violence.

Butler became a subject of the investigation only after surveillance of the wiretapped lines captured a phone call during which the participants discussed facilitating a firearm purchase. Police claimed to recognize Butler's voice from an interaction years prior; they also linked his identity to the phone number through a social media search, by locating a Facebook account under the username "Fastlife Blizzy (Blizzy Hoe)," which featured Butler's image. Based on this information, the State successfully sought a wiretap on Butler's phone and intercepted conversations in which Butler confirmed his identity and mentioned CDS distribution.

Subsequent surveillance focused on Apartment 16D of the Delsea Gardens Apartment Complex. Officers observed Butler outside and entering the apartment on two occasions; they once saw him in a Nissan Maxima, which was not registered in his name. On September 23, 2016, an officer

3

conducting surveillance at Delsea Gardens testified that he observed a suspected drug transaction between the occupants of two cars: a maroon Pontiac Trans Am and a tan or beige Nissan.

The officer could not positively identify the driver of either car, nor did he observe any exchange of drugs or money. The officer also did not see what was in either individual's hands. However, after pulling over the Pontiac, police found Joshua Phillips in possession of crack cocaine and heroin. Phillips later stated to police that he had purchased the drugs from an individual known as "Blaze." At trial, Phillips's in-court identification of Butler as "Blaze" was at best equivocal: Phillips stated that Butler "may or may not have been him" and admitted he was high at the time he made his first identification following his arrest and did not recall whether he was shown only one photo or several.

Officers testified at trial that the results of their surveillance, combined with a controlled purchase of CDS from Butler by a confidential informant, provided them with sufficient evidence to obtain a search warrant for Apartment 16D.

On September 28, 2016, police executed the warrant. Butler and the apartment's leaseholder, Rafael Gonzalez, were not present; Adam Yurdock and several children were found inside. Police recovered heroin, cocaine, drug

4

paraphernalia, and two revolvers -- a .22 caliber (subsequently claimed by Gonzalez) and a .38 caliber, which was found between couch cushions. Regarding the second weapon, the .38 caliber gun, Gonzalez originally provided a statement in which he attributed the gun to Butler. But at trial, Gonzalez recanted, testifying he had never seen Butler with a gun, explaining that he was angry with Butler at the time he made that statement.

On the day the search warrant was executed, Butler was arrested while driving the Nissan Maxima with his girlfriend, Tiffany Parker-Alexander. A search incident to arrest revealed $875 in cash on Butler's person and three cell phones identified as belonging to Butler and Parker-Alexander, but no CDS or weapons. Data extracted from the cell phones later established that Butler used the nickname "Blaze" and managed the user profile "Fastlife Blizzy (Blizzy Hoe)." Text messages referenced the police search of Apartment 16D, and the location data for one phone placed it at or near the apartment complex at times relevant to the investigation. Additional messages on Parker-Alexander's phone included communications with "Blaze" about shared appointments and confirmed arrangements to meet for a doctor's appointment.

Before trial, defendant moved to preclude or sanitize the State's references to the warrants issued or executed in the case. Defendant also

5

objected to any potential testimony identifying Butler as the "target of a search warrant at Apartment 16D." The State agreed and suggested that, under State v. Cain, 224 N.J. 410 (2016), "lawful search" or "valid search" were appropriate phrases to use in front of a jury when referring to searches performed subject to a search warrant. The court instructed the State to use the phrase "lawful search" and not to mention "search warrant." The State agreed, and both sides accepted this approach.

Defendant also requested that officers be barred from referring to their unit: the "Organized Crime Bureau." The State responded by offering to craft a limiting instruction that the jury should not infer anything from the name of the specialized unit. Defense counsel requested time to consider the suggested instruction but never raised the concern again; counsel also did not request a limiting instruction.

B.

At trial, the State's opening statement began with multiple references to the television show The Wire. The prosecutor told the jury:

> You heard a little bit from the Judge about what this case was about. You heard about drugs. You heard about guns. But it's a little bigger than that, because all those guns and drugs go together. This is also a case about a phone intercept, what's also known as a wire.
>
> And there was a few years ago, many years ago now, that show on tv called The Wire. And in that show there

6

was in Baltimore a rash of crime happening within the community. It seemed very organized. People were always at certain locations. They seemed to be following a hierarchy, or someone's orders. And they were trying to figure out how guns and drugs were coming into their community. And while they were trying to surveil all these different locations, they used all of the investigative means that they had available to them, they still weren't able to really crack down.

But they were eventually able to realize that there was a person they needed to focus on. The only way to really find out how the guns and drugs were flowing in the community was to get on that person's phone. So they got an intercept known as the wire.

That's similar to this case. Back in August to September in 2016, in the City of Millville, the county prosecutor's office, specifically the Organized Crime Unit, got their own wire. And they did this because there was a rash of violence that was happening throughout Millville and throughout the summer of 2016. And they wanted to know what was the emphasis of that, what was the origin? Where was it coming from? Who was involved?

And so much was happening that they finally decided they needed to get on a wire. So as they narrowed down their investigation, they narrowed it down to four individuals. And the names of those individuals are not important to you because none of them are Mr. Butler. But do understand that that's how the investigation began.

So they go on each of these individuals' phones. And they're listening, and the officers are picking up gun sales, where to meet, what kinds of guns, where it's coming from. There's also discussions about drugs, how much to sell them for, where to meet in person.

7

. . . .

> I end with this. That <u>very much like the show The Wire</u>, sometimes the targets tell on themselves. So as you're listening to all of the other witnesses, and you're going to listen to the calls, you're going to hear the texts and also listen to the calls, what is he telling you about what he's doing?
>
> [(emphases added).]

Defense counsel raised an objection immediately following the State's opening statement, arguing that the references to pop culture were "over the top."[1] The trial court overruled the objection, determining that the comments were not "overly prejudicial." Following opening statements, the State's evidence relied heavily on intercepted phone calls and texts, digital evidence attributed to Butler, observations of Butler at Apartment 16D, and related circumstantial evidence. Both Phillips's identification and Gonzalez's attribution statements were strongly contested and qualified at trial; both witnesses expressed ambivalence or recanted prior statements connecting Butler directly to drugs or firearms in the apartment. No fingerprints, DNA, or other forensic evidence physically connected Butler to the contraband or firearms.

---

[1] Because the transcript of this precise moment includes several entries listed as "inaudible," the entirety of the objection and ensuing exchange is not included in the record.

8

The State also relied on the testimony of a series of law enforcement witnesses, each of whom played distinct roles in the investigation. Several were directly employed by the Cumberland County Prosecutor's Office OCB, while others worked for outside agencies but actively participated in the operation.

For example, Sergeant Ryan Breslin, testifying as a member of the OCB, described the overarching purpose of the investigation as follows:

> Q: And could you explain for the jury what the purpose of this investigation was?
>
> A: This investigation was to target individuals that had been involved in violence in the city of Millville, as well as weapons trafficking throughout the county.
>
> . . . .
>
> Q: So as a result of finding these groups of people, what did you then do?
>
> A: So we -- what do you mean?
>
> Q: Okay. So you said that you found an individual who was selling guns. What did you do to further your investigation?
>
> A: So we attempted to -- for this one individual, we attempted to conduct a purchase of a firearm from that individual with a undercover officer. That was in September, or late August, or early September of 2016.

Breslin later clarified for the jury:

Q:  Sergeant Breslin, going back to the sale of the weapon, that did not involve Mr. Butler?

A:  What --

Q:  The one that you were -- we were just talking about.  That did not involve Mr. Butler?  This is a separate target?

A: Correct.

Defendant objected to the line of testimony regarding the Millville shootings and associated violence on relevance grounds, but the trial court overruled the objection and allowed the testimony to proceed.  Specifically, the court permitted the State to elicit information from Sergeant Breslin not only concerning the shootings in Millville, police efforts to address county-wide violence, and firearms trafficking, but also about investigative actions (such as the attempted undercover firearm purchase) unrelated to Butler himself.

Throughout their testimony, officers identified themselves as members of the OCB.  In direct examination, for example, Breslin stated that his role at the time was with the OCB and another officer described the coordination with Millville and Vineland officers participating in "Operation That's All Folks."  Officers repeatedly referenced the OCB, explaining the unit's function as tackling violent crimes and gun trafficking in Cumberland County.  The defense's objections to those references were limited to those raised pretrial.

10

After the trial began, the defense did not object to the consistent references to the OCB.

The State also played for the jury a series of intercepted calls featuring coded language such as "dime," "brick," and "bread." The terms were explained for the jury by the State's expert witness, who testified extensively about street language and narcotics distribution networks. But in those specific calls, there was no explicit discussion of firearms.

Moreover, despite defense counsel's objections and acknowledgment that the officers had permission to conduct the search, the State consistently questioned witnesses about the search itself. This approach resulted in law enforcement witnesses repeatedly referencing the term "search warrant" in their responses, on a continuing basis. Throughout this line of questioning, the trial court consistently overruled defense objections.

When the State called Phillips to testify, he invoked his Fifth Amendment right on multiple questions before ultimately agreeing to answer, after stating he felt guilty about doing so. Phillips testified about purchasing drugs from "Blaze," whose actual name he did not know, and identified Butler in court as "someone that may or may not have been him."

Gonzalez testified he never witnessed defendant with a gun, was unaware of any drugs in the apartment, and allowed Butler to stay at his

11

apartment whenever Butler wanted. The State played a recorded conversation between Gonzalez and the police in which Gonzalez said he allowed Butler to keep personal items in the kitchen cabinet -- where police happened to recover drugs.

Yurdock, who was present during the Apartment 16D search, also testified at trial. Yurdock reiterated he was unaware that there were guns or drugs in the house.

In summation, the prosecution again referred to the scope and nature of the investigation, emphasizing to the jury:

> You learned that there was a huge, wide-scale operation, known as 'That's All Folks,' and you also know that Mr. Butler was not the initial target of that investigation, he kind of came up just out of the blue, and it was the first session you listened to this morning, and that drew their attention, because it's going to be up to you to determine what was that call about, in the context of the overall investigation, which you knew it was about gun violence in the City of Millville.
>
> [(emphasis added.)]

Defendant did not object at that time.

The jury acquitted Butler of the weapons offenses and convicted him solely of offenses relating to CDS: second- and third-degree conspiracy, distribution, and possession. All firearm-related counts were either resolved by a not guilty verdict or dismissed.

12

## C.

On appeal, Butler raised several arguments. Relevant here, he contended that the trial was irreparably tainted by: (1) the State's opening statement comparing his conduct to that depicted in the television show The Wire; (2) the State's summation and testimony suggesting he was part of a violent network of organized crime involving shootings and gun trafficking, as well as testimony referencing the involvement of the OCB and the execution of search and arrest warrants targeting Butler; and (3) that these errors, both individually and cumulatively, required reversal.

The Appellate Division rejected Butler's argument regarding the references to The Wire, finding that the statements were not intended to "inflame the jurors or divert them from the evidence but to reasonably introduce them to the concept of a wiretap, which was at the core of the State's case." The court found no error, reasoning that the State used the television show as an analogy to explain that "sometimes the targets tell on themselves" and that, "in reading defendant's intercepted texts and listening to his calls[,] they should focus on what [Butler] 'is . . . telling you about what he's doing?'"

The court also noted that the State did not reference The Wire again in closing, and regardless, Butler's counsel did not object to the summation. Accordingly, the court applied plain error review. Although it found that the

portion of the summation relating to gun violence was "unnecessary" and improperly suggestive, it held that this did not satisfy the "high bar of plain error."

Turning to the testimony implying Butler's involvement in shootings and other violent crimes, the Appellate Division again emphasized that Butler's counsel failed to object. The court acknowledged the improper nature of the testimony but found that it "more broadly described only the impetus for the investigation that led to [Butler's] arrest." Further, the court reasoned that the State neither asserted nor suggested Butler's participation in weapons trafficking and underscored that the jury acquitted him of the gun charge. The court concluded that this testimony was also "not clearly capable of producing an unjust result" amounting to plain error.

Regarding the repeated references to the search warrants and related language, the Appellate Division observed that "[i]f objections to the testimony had been made," the trial court likely would have sustained them. However, because Butler's counsel failed to object and the references "were brief," the appellate court determined that arguments against those comments, "either alone or in combination," were insufficient to produce an unjust result.

This Court granted Butler's petition for certification, limited to consideration of: (1) the State's references to "The Wire; testimony elicited by

14

the State that [Butler] was the subject of a search warrant; and references to the 'Organized Crime Unit,' gun violence, and trafficking in the City of Millville; and [(2)] whether the cumulative effect of the purported errors deprived [Butler] of a fair trial."  260 N.J. 307 (2025).

We also granted the applications of the Association of Criminal Defense Lawyers of New Jersey (ACDL) and the American Civil Liberties Union of New Jersey (ACLU) to participate as amici curiae.

## II.

Butler contends that his convictions should be overturned because the State, instead of limiting itself to the evidence properly before the jury, relied on references and witness testimony that undermined his right to a fair trial. Specifically, he points to the references and comparisons to The Wire and the show's violent plot, as well as police testimony that the investigations involved weapons and violence, which he maintains were irrelevant, improper, and prejudicial.  Butler further contends that references to the warrants -- particularly the statement that the Apartment 16D search warrant targeted him -- were prejudicial because they improperly suggested the existence of evidence not before the jury that pointed to his guilt.  To Butler, the use of the unit name "Organized Crime Bureau" was improper and unfairly prejudicial,

15

and the cumulative effect of these errors unfairly prejudiced the jury and deprived him of a fair trial.

In response, the State asks this Court to uphold Butler's convictions, arguing that the alleged errors are not prejudicial, either individually or cumulatively. The State maintains that the references to <u>The Wire</u> were used only "to introduce" the concept and purpose of a wiretap and did not compare Butler to the violent aspects of or characters in the show. The references to the OCB and "Operation That's All Folks" were relevant, according to the State, because they explained the context of the case. The State also asserts that references to Butler as the target of the search warrant were merely explanatory and not improper or suggestive of undisclosed evidence.

In support of Butler, the ACDL argues that the State's references to <u>The Wire</u> were intended to draw a direct comparison between the criminality and drug distribution in Millville and the "violence and lawlessness portrayed consistently in episodes" of the television show. The ACDL also echoes Butler's claims regarding improper testimony.

The ACLU contends that the State's opening statement should be held to the heightened standards applicable to prosecutors in the criminal justice system. Notably, the ACLU cites research indicating that up to ninety percent of jurors reach their verdict during or immediately following opening

16

statements. The ACLU asserts that if the State sought to explain the context of the case and the mechanics of a wiretap, it was unnecessary to rely on popular culture and fictional references with the inherent risk of improper inferences, especially in the face of "simple and self-evident concepts."

### III.

The principal issue before us is whether a series of challenged statements and references made by the State during trial deprived Butler of his right to a fair trial. Specifically, Butler challenges references to the television show The Wire; mention of gun violence and gun trafficking in the City of Millville; testimony that Butler was the subject and target of search and arrest warrants; and the use of the unit label "Organized Crime Bureau." We review each of these claims in turn.

Each criminal defendant is guaranteed a fair trial under both the Federal and State Constitutions. State v. Greene, 242 N.J. 530, 547 (2020) (citing U.S. Const. amends. V, VI; N.J. Const. art. I, ¶ 1; State v. Jenewicz, 193 N.J. 440, 451 (2008)). In assessing whether that right has been compromised by improper testimony or argument, our inquiry does not focus on the intent or motives of counsel. See ibid. Rather, the question is whether the challenged conduct, regardless of how it arose, had the capacity to prejudice the jury and thereby undermine the fairness of the proceedings. Ibid. Even errors

17

innocently made may infringe upon fundamental constitutional protections. See ibid.

At the same time, we recognize that prosecutors shoulder the heaviest burden in our justice system. Charged with proving guilt beyond a reasonable doubt, they are equally obliged to safeguard the accused's constitutional rights, all while advancing the interest of the State and giving voice to victims impacted by crime. See State v. McNeil-Thomas, 238 N.J. 256, 274 (2019). In pursuit of justice, however, prosecutors must strive not merely for conviction but must act within the bounds of the evidence in a case. See State v. Williams, 244 N.J. 592, 607 (2021). As we have cautioned, "[i]f fairness and justice are forgotten in the pursuit of a guilty verdict, the integrity and authority of our criminal justice system is challenged." Ibid. (quoting State v. Smith, 212 N.J. 365, 403 (2012)). Thus, prosecutors "may strike hard blows, but not foul ones." Ibid. (alterations omitted) (quoting Smith, 212 N.J. at 403); see also State v. Ramseur, 106 N.J. 123, 323-24 (1987).

In their first and final communications with the jury, prosecutors are expected to make "vigorous and forceful" presentations during opening statements and summations. Williams, 244 N.J. at 607 (quoting State v. Frost, 158 N.J. 76, 82 (1999)). Prosecutors are "afforded considerable leeway," provided that their comments are "reasonably related to the scope of the

18

evidence presented." Ibid. (quoting Frost, 158 N.J. at 82). However, if a prosecutor strays from the evidence and references extraneous matters, misconduct may result. Ibid. (citing State v. Jackson, 211 N.J. 394, 408 (2012)). When such misconduct occurs, courts "must weigh 'the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial.'" Id. at 608 (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)).

In assessing allegations of improper argument at trial, appellate courts consider the nature of the asserted error, the responses of counsel and the trial court, and any resulting harm. Ibid.; Frost, 158 N.J. at 83; State v. Marshall, 123 N.J. 1, 153 (1991). When a party fails to object to an alleged trial error or otherwise properly preserve the issue for appeal, an appellate court may nonetheless consider the issue if it meets the plain error standard of Rule 2:10-2. State v. Clark, 251 N.J. 266, 286-87 (2022). Under that standard, "[t]he mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016) (citing State v. Jordan, 147 N.J. 409, 422 (1997)). Rather, "[t]o warrant reversal by this Court, an error at trial must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (omission in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)). The error "must be evaluated in light of the overall strength of the State's case." Clark, 251 N.J. at 287 (internal

19

quotation marks omitted) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)).

Evaluating harmless error, on the other hand, requires the court to determine whether there is a real possibility that the error led to an unjust verdict; that is, whether the error was "sufficient to raise a reasonable doubt as to whether the" jury would have reached a different conclusion absent the error. Williams, 244 N.J. at 608 (quoting State v. Bankston, 63 N.J. 263, 273 (1973)). In other words, "the prosecutor's conduct must substantially prejudice the defendant's fundamental right to have a jury fairly evaluate the merits of his defense.'" Id. at 608-09 (internal quotation marks omitted) (quoting State v. Roach, 146 N.J. 208, 219 (1996)). When that threshold is exceeded, "a prosecutor breaches [the] responsibility to see that 'justice is done.'" Id. at 609 (quoting Frost, 158 N.J. at 83).

And where multiple errors are alleged, we consider whether their cumulative effect rendered the proceedings fundamentally unfair. See State v. Burney, 255 N.J. 1, 29 (2023).

It is within this framework that we examine the challenged aspects of the State's presentation.

A.

We first consider whether the prosecutor's opening statement and summation included comments that exceeded the permissible bounds and had the capacity to prejudice Butler's right to a fair trial.

Our case law sets forth clear parameters governing a prosecutor's opening statement. An opening must be "limited to the facts the prosecutor intends in good faith to prove by competent evidence." Greene, 242 N.J. at 548 (brackets and internal quotation marks omitted) (quoting Wakefield, 190 N.J. at 442). Its purpose is to outline the State's anticipated proofs, not foreshadow the final argument. See ibid. Although a prosecutor may describe evidence in reasonable detail, they have a corresponding obligation to present admissible proof supporting those assertions. Ibid. A prosecutor's failure to do so risks prejudice to the defendant and jeopardizes the fairness of the proceedings. See ibid.

"In the end, 'the court must patrol the boundaries of propriety of a prosecutor's opening statement to ensure that a defendant's right to a fair trial is not compromised.'" Ibid. (brackets omitted) (quoting State v. Timmendequas, 161 N.J. 515, 577 (1999)).

At the outset of trial here, the prosecutor invoked The Wire, a television series widely known for its portrayal of organized crime, violence,

21

intimidation, and murder, thus analogizing the events leading to the Millville investigation to a large-scale violent criminal enterprise. Defendant, however, was not identified as a primary participant in the city's outbreak of violence.

Although the Appellate Division characterized the reference as a reasonable means of explaining the wiretap evidence, the analogy bore little relevance to the charges or proofs ultimately presented at trial. Instead, the reference invited jurors to associate defendant with violent criminal conduct -- an association untethered to the evidence that created a risk of distracting the jury from its obligation to assess guilt based solely on the facts presented at trial. Referencing the series in the opening minutes of trial effectively framed the jury's understanding of the case and overshadowed the evidence the State intended to present.

This Court has previously cautioned against relying on pop culture references at trial. In Williams, extraneous references to works of fiction were found to pose a substantial risk of prejudice by insinuating guilt through association with violent or unsavory characters and themes. See 244 N.J. at 615 (noting that referencing a violent and frightening scene from the movie The Shining in summation was not reasonably related to the evidence presented). Although the reference here was not a direct comparison to a character, its purpose and effect were similar: casting the defendant in a light

beyond the evidence. The State may not bolster its case with powerful or inflammatory imagery that supplants the jury's role to evaluate actual proof.

In assessing whether the prosecutor's references to The Wire constitute reversible error, we review whether the references sufficiently raised a reasonable doubt as to whether the jury would have reached a different conclusion. Id. at 608. We do not condone the prosecutor's use of a television show associated with violence and criminal enterprise to develop its theory. However, we are not persuaded that this fictional comparison, made at the outset of trial and not repeated in closing, by itself substantially prejudiced Butler's fundamental right to have a jury fairly evaluate the merits of his defense. It cannot be said that the reference to The Wire here was identical to that of The Shining in Williams, as argued by Butler and amici.

That is because the mention of the show was isolated; the jury was instructed to base its verdict solely on the evidence before it; and the substantial evidence of Butler's guilt presented at trial makes it unlikely that the outcome turned on this improper analogy. The reference was part of a broader structure the prosecutor was building, which relied on evidence that was never introduced, nor part of the State's case. Although unnecessary, the reference, by itself, did not clearly have the capacity to lead to an unjust result; it does not, therefore, warrant reversal.

23

B.

Next, we next consider whether the prosecutor's repeated references to gun violence and trafficking created the possibility of affecting the jury's verdict.

The risk of prejudice in this case was apparent. Repeated references to gun violence, the broader impact of violence in the Millville community, and organized criminal activity were emphasized, even though those generalizations were tethered neither to Butler nor to the charges presented. Throughout the trial, the prosecutor and the State's witnesses invoked imagery of a community suffering from a "rash of violence," "gun violence," and widespread drug and weapons trafficking -- elements not ultimately substantiated by the evidence against Butler. Those references were clearly intended to associate Butler with uncharged violent conduct and broader organized criminal activity. That was plainly improper.

Police may explain the context and genesis of an investigation where needed; however, such background testimony cannot be used as a disguised means of suggesting a defendant's propensity for crime or involvement in unrelated criminal conduct. See N.J.R.E. 404(b); State v. Goodman, 415 N.J. Super. 210, 228 (App. Div. 2010); State v. Holmes, 255 N.J. Super. 248, 251 (App. Div. 1992). The charged offenses form the prism through which the

24

State must prove its case. By constructing a narrative replete with extra-evidentiary references to rampant violence, gun trafficking, and massive conspiracies, the State risked misleading the jury. Such a presentation threatened to unjustly associate defendant with uncharged, community-wide wrongdoing, despite the absence of proof of such an association.

The Appellate Division's finding that plain error applies is belied by the record on this issue. When the State questioned Sergeant Breslin on "[h]ow . . . Operation That's All Folks beg[a]n," defense counsel objected to the answer, which included Breslin's statement that "we had received information about several shootings being connected within the city of Millville." A sole objection may preserve the issue for review. Here, defense counsel objected, and that objection was overruled, properly marking the record for an appellate court's review.

The prosecutor's closing also included explicit reference to "gun violence in the City of Millville," reiterating for the jury that the investigation giving rise to defendant's case was set against a backdrop of broader violent crime. Specifically, the prosecutor stated: "it's going to be up to you to determine what was that call about, in the context of the overall investigation, which you knew it was about gun violence in the City of Millville." This remark, placing the defendant within the context of a wide-scale investigation

25

targeting violent offenses, risked unduly prejudicing the jury by associating him with criminal conduct -- namely, "gun violence" -- which was not at issue in the trial. The statement is problematic because, although it reminds the members of the jury of their duty as sole judges of the facts by stating it is "up to them" to decide, it simultaneously diverts their focus from the charged offenses and encourages them to focus on a suggested link to community violence, rather than on the facts established at trial. As recognized in the appellate opinion, although the comment was fleeting and not found to constitute plain error, it was "unnecessary and improperly suggested defendant's involvement in wide-scale gun violence," underscoring the importance of limiting prosecutorial comments to avoid unfair prejudice and ensure the defendant's right to a fair trial.

Against that backdrop, we review this conduct for harmless error. Here, although the risk of prejudice was substantial -- especially given the repetition and the emotive framing -- we must consider whether other safeguards or the structure of the proceedings rendered the risk harmless. Notably, the evidence presented against defendant on the charged offenses was substantial; defense counsel had opportunities to object and, in some instances, did so, allowing for judicial intervention; and the trial court provided instructions limiting the jury's consideration to the evidence on the specific charges.

Moreover, the jury acquitted defendant of the weapons offense, giving some indication that it distinguished between generalized allegations and the actual evidence pertaining to Butler. This supports the finding that, despite the improper references, the jury was able to fulfill its role as factfinder with fidelity to the record. However, the presence of repeated, unsupported references to community violence and organized criminal activity -- matters not proven as to Butler -- require some comment. Such narrative "scaffolding" is unnecessary, unsupported by the evidence, and improper as a means to bolster charges. The prosecutor's duty is to provide the facts fairly, without prejudice or emotional manipulation, and to remain within the bounds set by the evidence and the charges.

Ultimately, although such recurring comments are strongly discouraged and risk undermining a trial's fairness, the record does not raise a reasonable doubt as to whether the jury's verdict in this matter was unjustly reached by virtue of this error alone.

## C.

We turn now to the prosecutor's repeated elicitation of the search warrant for Apartment 16D and the testimony that defendant was its target.

As a practical matter, prosecutors are not prohibited from referencing search warrants during the presentation of their cases. More importantly, the

27

State is not required to hide the fact that law enforcement acted pursuant to an authorized warrant.  See State v. Marshall, 148 N.J. 89, 240 (1997).  It is no secret that jurors generally understand that searches of private homes ordinarily require a warrant, and limited reference to a warrant may be necessary to avoid speculation that the police acted unlawfully or arbitrarily.  Ibid.

That principle, however, has limits.  When the existence of a search warrant is used to establish "the forbidden inference that the issuance of a warrant by a judge supports the rendering of a guilty verdict," the jury may be misled.  Cain, 224 N.J. at 433.  Where the legality of the search is not contested, repeated or emphasized references to the issuance of a search warrant -- particularly those highlighting that a judge authorized the search -- risk inviting jurors to draw the improper conclusion that a neutral judicial officer has already approved the State's evidence.  Creating such an inference impermissibly interferes with the jury's unique fact-finding role.

In State v. Cain, this Court reaffirmed Marshall but declined to impose a categorical bar on the mention of search warrants.  224 N.J. at 433 (citing Marshall, 148 N.J. at 240).  The Court observed that officers can reference they had a search warrant to show they had "lawful authority" to conduct a search and "to dispel any notion that police acted arbitrarily."  Id. at 435.  But

28

the Court emphasized that "repeated statements that a judge issued a search warrant for a defendant's home -- when lawfulness of the search is not at issue -- may lead the jury to draw the forbidden inference that the issuance of a warrant by a judge supports the rendering of a guilty verdict." Id. at 433. The prosecution may neither use a search warrant to suggest judicial endorsement of guilt nor introduce such evidence without a legitimate purpose. Ibid. The critical issue for consideration is not the number of references, but their purpose and effect. References that go beyond what is necessary to inform the jury that the officers were acting with lawful authority and instead focus the jury's attention on the "constant drumbeat that a judicial officer issued a warrant to search," carry little probative value and should be excluded. See id. at 434-36.

Here, the State repeatedly referred to Butler as the "target" of the search warrant over defendant's repeated objections, and despite having been instructed, during a pretrial hearing -- and having explicitly agreed -- to abide by governing case law and limit the mention to "lawful searches" only.

The testimony risked precisely the prejudice this Court identified in Cain: "A prosecutor . . . may not repeatedly mention that a search warrant was issued by a judge if doing so creates the likelihood that a jury may draw an impermissible inference of guilt." 224 N.J. at 435. However, Cain also made

clear that reversal is not automatic:  errors will be considered prejudicial subject to harmless or plain error analysis.  See id. at 436-37.  Even assuming that the defense objection was sufficient, and that harmless error is the appropriate standard, the explicit, repeated references to the warrant, although improper, would not require reversal unless they were sufficient to raise a reasonable doubt as to whether the error led the jury to a result it might not otherwise have reached.  Williams, 244 N.J. at 608.

Here, the State presented evidence through its wiretap, coded communications, testimony about drugs recovered, and digital forensics, all tying Butler to the alleged activity.  Notably, the jury's acquittal of Butler on the weapons charges -- despite references to the search warrants targeting Butler -- suggests that the jury distinguished Butler's status as the subject of the search warrant from his personal culpability regarding the weapons found at the apartment.  The verdict indicates that the jurors did not conflate the State's assertion that defendant was the target of the search warrant for the apartment with actual guilt as to the charged firearms offense.

It cannot be overlooked, however, that the State expressly agreed to limit its language to "lawful search" and then violated that stipulation, repeatedly eliciting improper references in direct examination of its own witnesses, many of whom were professionals trained to testify in court and fully capable of

30

understanding the significance of legal stipulations and restrictions. As a result, the defense's objections, grounded in this Court's precedent, should have been sustained, and the State should have abided by its pretrial agreement.

The jury acquitted Butler of the gun charge, indicating that, even in the face of repeated improper comments and references, the panel weighed the evidence against Butler and was not improperly swayed by its repeated, yet impermissible, use. Although the trial court erred in overruling defense objections, and the State should not have repeated the same mistake after agreeing to the contrary, these errors, standing alone, likely satisfy the harmless error standard. See Williams, 244 N.J. at 608.

D.

That said, not all references are equally prejudicial. The references to the OCB are fundamentally different from other contested remarks. Law enforcement routinely uses distinct unit and operation names for a variety of legitimate reasons, including operational security, internal organization, team morale, and mnemonic convenience. Such code names are often conceived long before any particular defendant is identified or tried. They reflect routine law enforcement practice rather than an implicit characterization of any individual defendant.

We see no principled basis to generally prohibit use of such unit names at trial. Importantly, defense counsel was expressly given the opportunity to request a limiting instruction to address any legitimate concerns over possible prejudice stemming from the unit's name. In this case, the parties recognized the issue before trial: They mutually agreed that, should the defense seek a limiting instruction, the State would be given the chance to propose one and the trial court would consider it as part of preparing the final jury charge. Nonetheless, defense counsel reserved the right to consider, but ultimately did not pursue that instruction at any point before or during trial. Any potential prejudice was meaningfully addressed by the parties during the trial process. The defense's strategic decision not to request a limiting instruction, after it was offered, cannot now form the basis to argue that the reference to OCB was an error, let alone plain error.

Going forward, how parties choose to address this sort of isolated concern can easily be resolved in pretrial conferences, as was done here. But on this record, where the procedural safeguard was presented and unused, the Court discerns no plain error warranting reversal.

IV.

A.

We now address whether these errors, taken together, justify overturning the jury's verdict. "An appellate court may reverse a trial court's judgment if the cumulative effect of a series of errors is so great as to deprive a defendant of a fair trial." Burney, 255 N.J. at 29. We do not focus our analysis on the number of mistakes but rather consider whether the errors together amount to an injustice. See Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 85-86 (2024). "[I]f the combined effect of multiple errors deprives a party of a fair trial, an appellate court should order a new trial." Torres v. Pabon, 225 N.J. 167, 191 (2016). Where an error involves a constitutional right, reversal is warranted unless we can conclude beyond a reasonable doubt that the cumulative errors were harmless. State v. Rivera, 437 N.J. Super. 434, 444 (App. Div. 2014) (relying on State v. Weaver, 219 N.J. 131, 162 (2014)).

B.

In this case, references to the television show The Wire, unsolicited framing of the investigation as a response to large-scale gun violence and organized crime in Millville risked inviting the jury to associate Butler with criminal conduct and violence far beyond the evidence adduced at trial. That problem was compounded by repeated mention of Butler as the "target" of the

judicially authorized search warrant for the apartment, which invited jurors to infer the Court found the evidence against him credible.  <u>Cain</u>, 224 N.J. at 436.

It is true that each of those instances, viewed in isolation, may not have altered the jury's verdict.  The reference to <u>The Wire</u> was limited to opening statement and not repeated in summation; the jury was instructed to decide the case solely on the trial evidence.  Improper reliance on background violence and weapons trafficking, unsupported by specific evidence against Butler, was paired with direct proof on the charged narcotics offense.  Mentions of warrants and "target" status, though contrary to the State's agreement and judicial admonition, did not result in a conviction on the weapons counts, suggesting the jury was sensitive to distinctions among the evidence.

However, the cumulative effect of these repeated references must be assessed not by their frequency alone, but by their compounded impact on the jury's impartiality.  When a defendant is repeatedly, even if only implicitly, portrayed as connected to violent crime and subject to judicial scrutiny, limiting jury instructions and acquittal on certain counts cannot entirely neutralize the potential for bias.  The risk is not limited to the counts for which the defendant was acquitted; rather, it extends to all decisions the jury was required to make -- including those relating to the charged offenses for which Butler was convicted.

The defense raised objections to these references and even entered an explicit pretrial agreement as to the proper terminology for warrants. The State's repeated deviation from those agreed limitations, whether intentional or not, compounded the confusion and prejudice. Although the jury resolved the weapons offenses in defendant's favor, the narrative structure assembled by the prosecution of large-scale weapons trafficking, drug trafficking, and violent crime still risked coloring the jurors' attitudes and deliberations regarding the remaining accusations.

Thus, although we find that no single error alone requires reversal, we cannot conclude, beyond a reasonable doubt, that the aggregate effect of these improper references did not deprive Butler of a fair trial. The overall impact of repeated analogies to organized violence, improper emphasis on Butler being the "target" of a judicially sanctioned search warrant, and rhetorical scaffolding extending beyond the facts of the case was inconsistent with Butler's right to have his guilt or innocence evaluated solely based on admissible evidence.

The cumulative effect of these errors cannot be overlooked. The State's framing of the case blurred the lines between facts properly before the jury and emotional undertones of uncharged violence, which created a real risk that the verdict was tainted by improper influence. Butler was entitled to a trial

35

decided exclusively on the relevant facts and evidence, undistorted by extraneous themes and references that had no place in the jury's deliberations.

## V.

Accordingly, the cumulative effect of the identified errors deprived Butler of his right to a fair trial. The judgment of the Appellate Division is reversed and a new trial is ordered.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and HOFFMAN join in JUSTICE NORIEGA's opinion.